**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD S. BLOOM, DAVID C. GREENFIELD, DAMIAN L. SMIKLE and JUSTIN A. STERNHELL, on Behalf of the Profit Sharing Plan for Employees of AllianceBernstein L.P., Themselves, and All Others Similarly Situated, | No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| ALLIANCEBERNSTEIN L.P., COMPENSATION AND WORKPLACE PRACTICES COMMITTEE OF ALLIANCEBERNSTEIN CORPORATION, RAMON DE OLIVEIRA, PAUL L. AUDET, DANIEL G. KAYE, KRISTI MATUS, MARK PEARSON, BERTRAM L. SCOTT, ADMINISTRATIVE COMMITTEE, INVESTMENT COMMITTEE, and JANE and JOHN DOES 1-20, | |
| Defendants. | |

## I.     INTRODUCTION

1.     Plaintiffs Donald S. Bloom, David C. Greenfield, Damian L. Smikle, and Justin A. Sternhell (collectively, "Plaintiffs"), who are participants in the Profit Sharing Plan for Employees of AllianceBernstein L.P., otherwise known as the AllianceBernstein 401(k) Plan (hereafter, the "Plan") individually on behalf of themselves and all others similarly situated, and on behalf of and for the benefit of the Plan, allege as follows:

2.     This case is about a company's self-dealing at the expense of its own workers' retirement savings.  Defendants were required by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 *et seq.*, to act solely in the interest of the Plan's participants and beneficiaries (the "Participants") when making decisions with respect to selecting and monitoring the Plan's investments, including the performance of those investments.  Rather than fulfilling these fiduciary duties, among the "highest [duties] known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982), by offering Plaintiffs and the other investors in the Plan only prudent investment options, Defendants selected for the Plan and repeatedly failed to remove or replace imprudent proprietary investments ("AllianceBernstein Options") managed and offered by Defendant AllianceBernstein L.P. ("AllianceBernstein," "AB," or "Partnership")[1] and/or its subsidiaries or affiliates.  These funds were not selected and retained as the result of an impartial or prudent process but were instead selected and retained because Defendants benefited financially from their inclusion in the Plan to the detriment of the Participants.  By choosing and then retaining these proprietary investment funds, to the exclusion of alternative investments available in the 401(k)-plan marketplace, Defendants enriched themselves at the expense of their

---

[1]     AllianceBernstein Corporation (the "Company"), an indirect wholly owned subsidiary of Equitable Holdings, Inc. ("EQH"), is the General Partner of the Partnership.

own employees.  Defendants committed further statutory violations by engaging in conflicted transactions expressly prohibited by ERISA.

3.      This is a civil enforcement action under ERISA and, in particular, ERISA §§404, 406, 409, and 502(a), 29 U.S.C. §§1104, 1106, 1109, and 1132(a).  Plaintiffs bring this action on behalf of the Plan and similarly situated Participants for, *inter alia*, losses to the Plan and for disgorgement of unlawful fees and profits.

4.      This class action is brought on behalf of Participants who invested in the Plan from December 14, 2016 through the present ("Relevant Period").

## II.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

7.      Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because Defendants maintain a corporate office in this District.

## III.    PARTIES

### A.     Plaintiffs

8.      Plaintiff Donald S. Bloom is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held AllianceBernstein Options in his Plan account during the Relevant Period.

9.      Plaintiff David C. Greenfield is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held AllianceBernstein Options in his Plan account during the Relevant Period.

10.     Plaintiff Damian L. Smikle is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held AllianceBernstein Options in his Plan account during the Relevant Period.

11.     Plaintiff Justin A. Sternhell is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held AllianceBernstein Options in his Plan account during the Relevant Period.

## B.     Defendants

12.     Defendant AllianceBernstein provides investment management and research services.  AllianceBernstein is incorporated in Delaware and maintains a corporate office at 1345 Avenue of the Americas, New York, New York.  According to the Summary Plan Description for the Plan, dated July 2019 ("2019 SPD"), AllianceBernstein is both the Plan Sponsor and the Plan Administrator.  During the Relevant Period, through its directors, officers, committees, and employees, AllianceBernstein has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

13.     Upon information and belief, Defendant Compensation and Workplace Practices Committee ("Compensation Committee") is one of the four standing committees of the Board of Directors ("Board") of the Company.[2]  Pursuant to its Charter, the primary purpose of the

---

[2]     Under the AllianceBernstein Corporation Charter of the Compensation Committee, as adopted on September 23, 2020, this "Committee shall consist of two or more directors who meet the independence requirements established by the Board and applicable laws, regulations and listing requirements, and at least one director who is the Chairman of the Board of [EQH], the Chief Executive Officer of EQH[,] and/or an executive officer of any parent company of the Corporation ('EQH Representative').   The Corporate Governance Committee shall make recommendations to the Board with respect to the directors to be members of the Committee and with respect to any vacancies on the Committee.  The Board may remove a member from the Committee at any time, with or without cause.  Unless a Chairperson is elected by the Board, the members of the Committee may designate a Chairperson by majority vote of the full Committee membership."

Compensation Committee is, *inter alia*, to oversee compensation and compensation-related matters of the Company.  As alleged below, according to Form 5500 for the Plan year ending on December 31, 2021 ("2021 Form 5500"), the Compensation Committee is responsible for appointing and therefore monitoring members of the Plan's Administrative and Investment Committees.  Among its other responsibilities delineated in the Charter, the Compensation Committee is tasked with "receiv[ing] reports from the committees of the various benefit plans [including the Plan] on an annual basis and more frequently, as circumstances dictate."  The Charter further notes that "[i]n carrying out its responsibilities, the [Compensation] Committee's policies and procedures should remain flexible in order to best react to changing conditions and to ensure that the [Company's] practices are of the highest quality."  During the Relevant Period, the Compensation Committee, through its members, including but not limited to, Defendants Ramon de Oliveira,[3] Paul L. Audet,[4] Daniel G. Kaye, Kristi Matus,[5] Mark Pearson,[6] and Bertram L. Scott, managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

14.    Upon information and belief, Defendant Administrative Committee for the Plan (the "Administrative Committee") is composed of senior officers and employees of the Company. Further, according to Plan documents, members of the Administrative Committee are appointed

---

[3]    During the Relevant Period, Defendant de Oliveira also served as the Chairman of the Board and as a member of the Executive Committee of the Board.

[4]    During the Relevant Period, Defendant Audet also served on the Audit and Risk Committee of the Board.

[5]    During the Relevant Period, Defendant Matus has also served on the Corporate Governance Committee of the Board.

[6]    Defendant Pearson is the President and Chief Executive Officer of EQH.  During the Relevant Period, Defendant Pearson has also served on the Executive Committee and the Corporate Governance Committee of the Board.

and removed by the Compensation Committee at its discretion.  During the Relevant Period, the Administrative Committee, through its members, has managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

15.     Upon information and belief, Defendant Investment Committee for the Plan (the "Investment Committee") is composed of senior officers and employees of the Company.  Further, according to Plan documents, members of the Investment Committee are appointed and removed by the Compensation Committee at its discretion.  During the Relevant Period, the Investment Committee, through its members, has managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

16.     AllianceBernstein is also a party-in-interest to the Plan because it is a fiduciary to the Plan, an employer of participants in the Plan, and provides services to the Plan.  Defendant Pearson is also a party-in-interest to the Plan because he is an officer, director, and employee of the Company.

17.     To the extent there are additional directors, officers, and employees of AllianceBernstein who served as fiduciaries of the Plan during the Relevant Period, including members of the Compensation Committee, the Administrative Committee, and/or the Investment Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to add them to the instant action.  Thus, without limitation, unknown "Jane and John Doe" Defendants 1-20 include other individuals, including, but not limited to, the Company directors, officers, and employees, who served as fiduciaries of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) during the Relevant Period.

## IV.    THE PLAN

18.    The Plan covers eligible employees of AllianceBernstein and certain of its subsidiaries.[7]  According to the 2019 SPD, the Plan "is designed to assist [Participants] in achieving financial security for [their] retirement."

19.    The Plan is an employee benefit plan within the meaning of ERISA §§3(3) and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A), and a "defined contribution plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account.

20.    The Plan had 5,560 Participants with account balances as of the end of the Plan year ending on December 31, 2021 ("2021 Plan Year").

21.    The Plan had total assets valued at approximately $1,542,419,287 as of the end of the 2021 Plan Year.

22.    According to the 2021 Form 5500, "[t]he Plan is operated . . . by the Plan's Administrative Committee and Investment Committee, each of which is appointed by the Compensation . . . Committee."

23.    At all relevant times, Participants were allowed to direct the Plan to purchase investments from only those investment options that were available under the Plan and allocate them to their individual Plan accounts.

24.    During the Relevant Period, the Plan's investment options have included certain Common Collective Trusts consisting of (1) Lifetime Income Strategies ("LISs"),[8] (2) Customized

---

[7]    Effective January 1, 2004, the SCB Savings or Cash Option Plan for Employees ("SCOPE Plan") was merged into the Plan.

[8]    "LIS may invest in a combination of chosen investment vehicles including, but not limited to, collective trusts, mutual funds and separate accounts (collectively the 'Underlying

Retirement Strategies ("CRSs"),[9] and (3) Collective Investment Trusts ("CITs").[10]  The Plan also offers a government securities portfolio ("AB Government Cash"), which invests mainly in short-term securities issued or guaranteed by the U.S. government.

25.     Throughout the Relevant Period, the Plan has featured the LIS as its qualified default investment alternative ("QDIA").  *See*, *e.g.*, 2021 Form 5500.

26.     The LIS includes an insurance component.  Specifically, according to the Plan's SPD, if a Participant's LIS account is allocated to the Secure Income Portfolio ("SIP"), that Participant will be charged an insurance fee at an annual rate of 1% of the Participant's SIP account balance.  The SPD notes that "[l]ike any fee, the insurance fee will reduce the investment return of [Participant's] SIP."  Participants can be charged this insurance fee when their Plan funds are allocated to the SIP (beginning at age 50 at the earliest).

27.     According to the 2021 Form 5500 for the Plan, AB "serves as the investment adviser for these [the Plan] investments."  The 2021 Form 5500 further provides that "[w]ith the exception of the mutual funds, all Plan investments are managed by AB and are therefore considered to be party-in-interest transactions."[11]

---

Components').  The Underlying Components may include investments in the AB Collective Investment Trust Series (the 'Underlying Trusts')."  2020 Form 5500.

[9]     "CRSs invest primarily in a combination of Underlying Trusts."  *Id.*

[10]    "CITs invest in either Underlying Trusts or in a separate pool of assets constituting, in effect, a separate trust with its own investment objectives and policies."  *Id.*

[11]    The LISs and CRSs are held in custody by AB Trust Company, LLC, a wholly owned subsidiary of the Partnership.  2021 Form 5500.  The CITs and U.S. Government Securities are held in custody by State Street Investor Services.  *Id.*  The transfer agent for the LIS, CRS, and CIT investments held by the Plan is AB Investor Services, Inc., an indirect wholly-owned subsidiary of the Partnership.  *Id.*

## V.    DEFENDANTS' VIOLATIONS OF ERISA

### A.    Defendants' Process for Selecting and Monitoring Investment Options Was Imprudent and Tainted by Self Interest

28.    Pursuant to ERISA, plan fiduciaries, such as Defendants, must (i) discharge their plan-related duties for the exclusive purpose of providing benefits to participants; (ii) act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in like capacity and experienced with such matters would use under the circumstances; (iii) diversify plan investments; and (iv) act in accordance with the terms of the plan, insofar as plan terms comply with the statute. ERISA §404, 29 U.S.C. §1104. Notably, fiduciaries are under a continuing duty to monitor plan investments. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.")

29.    According to regulatory guidance issued by the U.S. Department of Labor ("DOL"), procedural due diligence undertaken by plan fiduciaries is meant to ensure that plan-related investment decisions are reasonable and in furtherance of the retirement plan's purpose:

> "[A]ppropriate consideration" shall include, but is not limited to (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action . . . .

29 C.F.R. §2550.404a-1(b)(2)(i).

30.    In order to fulfill their ERISA duties and advance the purposes of the plan under their watch, fiduciaries, such as Defendants, should scrutinize each plan investment on a regular basis with appropriate consideration for, *inter alia*, the risk of loss, the opportunity for return, diversification, and current and projected returns associated with that investment. Fiduciaries should also consider the size and bargaining power of a given plan in the course of their process of investment selection and monitoring.

31.     Here, the plan at issue, with over $1 billion in assets, is one of the largest defined contribution plans in the nation.  As such, throughout the Relevant Period, the Plan had tremendous bargaining power to obtain superior investments with a solid performance record.  In particular, at all relevant times, there have been many non-AllianceBernstein-branded and well-managed investment options in the 401(k)-plan marketplace available to the Plan.  Such options include registered mutual funds, exchange-traded funds, and non-registered commingled funds, such as bank collective or common trusts and insurance company pooled separate accounts.

32.     Yet, in derogation of their ERISA mandated duties, Defendants failed to consider the continued prudence of maintaining the AllianceBernstein Options in the Plan during the Relevant Period, despite other 401(k) investors exiting or decreasing their holdings in these funds at the time, and even as the AllianceBernstein Options underperformed their benchmarks, resulting in Plan losses.   Defendants' failure to monitor the continued prudence of retaining AllianceBernstein's proprietary investments in the Plan is all the more egregious in light of the availability of other non-affiliated investment alternatives with the same investment objectives, that were able to showcase a consistently superior performance record at all relevant times.

33.     No one investment management firm is good at everything.  Some investment management firms excel at providing fixed income investment products, others at equity investment products, and still others at international and emerging market investment products. Prudent fiduciaries for large plans understand this fact and accordingly take a "best of breed" approach in assembling menus of retirement plan investment options for their retirement plan investors, carefully and diligently searching among the various vendors in the retirement plan investment product market to construct a suitable and appropriately low-cost and diversified array of investment options.  Josh Cohen & Ben D. Jones, *Seven Attributes of an Excellent Defined Contribution Plan* 2, AMERICAN SOCIETY OF PENSION PROFESSIONAL ACTUARIES – RUSSELL

INVESTMENTS (2013), https://www.asppa.org/sites/asppa.org/files/PDFs/Magazines/Plan%20 Consultant/PC-Winter13-Cohen.pdf.[12]

34.     Here, however, Defendants did not consider or act in the best interests of the Plan throughout the Relevant Period.  Instead, Defendants put their own interests before those of the Participants, by using the Plan to promote and develop AllianceBernstein's investment management business (including using Plan assets as seed money for the newly launched proprietary AB funds) to the detriment of the Plan.  Indeed, with the exception of a government cash portfolio and a so-called "brokerage window"[13] built into the Plan, Defendants offered

---

[12]     Russell Investments is a retirement plan consultant and investment manager.  Its clients include AT&T, Inc., Boeing, Caterpillar, Duke Energy, Mazda Motor Corporation, Toshiba Corporation, and Union Pacific, among others.  *See Welcome to the Russell Investments website,* RUSSELL INVESTMENTS, www.russellinvestments.com/us/about-us (last accessed Nov. 16, 2022).

[13]     As the DOL has explained in regulatory guidance, an ERISA-covered retirement plan and its fiduciaries cannot reduce or eliminate their ERISA duty to monitor loyally and prudently retirement plan Designated Investment Alternatives like the AllianceBernstein Options at issue in this case simply by opening a so-called "brokerage window" for plan participants featuring an array of investment funds managed by firms other than AllianceBernstein:

> Also, fiduciaries of such plans with platforms or brokerage windows, self-directed brokerage accounts, or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan are still bound by ERISA section 404(a)'s statutory duties of prudence and loyalty to participants and beneficiaries who use the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement, including taking into account the nature and quality of services provided in connection with the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement.

*See* Field Assistance Bulletin No. 2012-02R (1) from John J. Canary (July 30, 2012), https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/ 2012-02r.

This principle has been recognized by courts as well:

> A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options.  Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person

Participants **only** the AllianceBernstein Options, thus treating Participants as captive investors to prop up the Partnership's investment management business, while other investors were exiting or decreasing their positions in these investments, and the Partnership was thereby losing the revenue from non-Plan investment sources.

35.     While an ERISA fiduciary's use of proprietary investment options in its employee 401(k) plan is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's process for selecting and monitoring proprietary investments **is** subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments, and if certain criteria for these investments are not met (especially over a prolonged period of time), fiduciary action must be taken to protect the plan.

36.     As courts recognize, prudent and unconflicted plan fiduciaries know or should know that no one investment fund family necessarily provides prudent retirement fund options across all asset classes and should thus engage in appropriate due diligence in selecting and monitoring each plan investment, including any proprietary funds.  *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-cv-10397, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (denying motion to dismiss in similar case brought against John Hancock and stating that "[i]n total, *the long-term retention of a substantial number of underperforming funds . . . gives rise to a plausible inference of an objectively imprudent monitoring process*.  That the retained underperforming funds were all proprietary John Hancock funds and that in some cases the plan was one of the last investors propping up a failing fund gives rise to the plausible inference of a

---

would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

*Pfeil v. State Street Bank & Tr. Co*., 671 F.3d 585, 597 (6th Cir. 2012) (overruled on other grounds).

subjective motive inconsistent with the plan participants' best interest" by the defendant ERISA plan fiduciaries) (emphasis added).[14]

37.     Given the facts alleged here, it is objectively not plausible that Defendants used unconflicted and prudent fiduciary judgment in selecting for the Plan's menu of designated investment alternatives an array of AllianceBernstein's own investments.

38.     Likewise, it is not plausible that Defendants faithfully followed a suitable Investment Policy Statement ("IPS"), outlining the process of diversifying the Plan investments, so as to minimize the risk of large investment losses by the Plan and its Participants.

39.     A fiduciary's failure to follow an appropriate IPS in investment selection and retention for a qualified 401(k) plan is of itself not a freestanding ERISA violation, but it is circumstantial evidence Defendants failed to use a viable and unconflicted fiduciary process with respect to the Plan's investments – and that process failure is an ERISA violation as set forth below.  It is again not plausible that each and every one of the AllianceBernstein Options in the Plan was chosen and retained pursuant to a rigorous evaluation, screening, and monitoring process involving, for instance, an appropriately detailed comparison to similar funds offered by competitor investment fund vendors to see how the AllianceBernstein Options compared to other vendors' funds with respect to performance history and other relevant metrics.[15]  Rather, the nearly

---

[14]     *See also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 912 (W.D. Mo. 2017) (denying motion to dismiss in similar ERISA case and observing that "[e]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty through improper decision-making, a claim can survive a motion to dismiss if the court may reasonably infer from what was alleged that the fiduciaries followed a flawed process").

[15]     *See, e.g.*, C. Frederick Reish & Bruce L. Ashton, *The Prudence Standard: Affiliated Products and Services* (June 2011), http://docplayer.net/12249737-The-prudence-standard-affiliated-products-and-services.html ("Thus, to meet the prudent process requirement, fiduciaries must thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  This means considering competing funds to determine which fund should be included in the plan's investment line-up.  As explained by the DOL in the preamble to the qualified default investment alternative regulations, '[a] fiduciary must engage in

100% proprietary fund line-up from a single fund family that the Plan featured throughout the Relevant Period is the product of self-dealing and imprudence by Defendants.

40.     As set forth below, the relevant investment performance data, as well as the proprietary nature of the Plan investment selections, all support a strong inference that Defendants failed to follow a prudent process in selecting and then monitoring the menu of investment options for Plaintiffs and other Participants who invested in the Plan.  Contrary to their fiduciary duties to act in the Participants' best interests, Defendants' near-exclusive selection and retention of AllianceBernstein's proprietary investments as Plan investment options during the Relevant Period (despite these funds' poor performance, availability of superior unaffiliated investments with demonstrably better performance records, and outflow of other investors from the proprietary funds) indicate that the Defendants' decision-making was tainted by the self-serving purpose of promoting and supporting the Partnership's own funds, regardless of the detrimental impact of that investment strategy on their employees' retirement savings.

**B.     Defendants Maintained the Plan in Consistently Underperforming LIS Options, When Other Investment Vendors Offered Better-Performing Alternative Investments**

41.     In October of 2014, prior to the start of the Relevant Period, the Plan began to offer a new proprietary investment option called the Lifetime Income Strategy.  The LIS, managed by Defendant AllianceBernstein, is "an age-based asset-allocation investment" (2019 SPD), akin to the so-called target date funds designed to provide a model asset allocation based on a given

---

an objective, thorough, and analytical process that involves consideration of the quality *of competing providers and investment products*, as appropriate.'") (emphasis in original) (citation omitted).

investor's projected retirement date, *i.e.*, the target date.[16]  Without any existing performance history, this new option immediately became the Plan's QDIA.[17]

42.     Upon being introduced to the Plan, the LIS replaced Retirement Strategies funds, also a proprietary AllianceBernstein investment series maintained in the Plan as of 2008.[18]  Following their removal from the Plan, the Retirement Strategies funds were altogether eliminated by Defendant AllianceBernstein as of June 25, 2015.  As noted at the time by the industry observers, the termination of the Retirement Strategies was not unexpected.  On September 30, 2014, *Morningstar* rated the Retirement Strategies as a Negative overall, particularly for Performance, Process, People, and Parent, stating, "Overall, this series is among the industry's weaker options."  On March 31, 2015, *Morningstar* rated the Retirement Strategies funds as a Negative for Performance, stating, "the long-term risk-adjusted returns for the single-manager series 'rank among the target-date industry's worst, and assets have poured out accordingly."  Robert Steyer, *AllianceBernstein to close underperforming single-manager target-date series*, PENSIONS & INVESTMENTS (July 14, 2015), https://www.pionline.com/article/20150714/ONLINE/150719941/alliancebernstein-to-close-underperforming-single-manager-target-date-series.  According to *Morningstar*, the Retirement Strategies "'has seen net outflows in every

---

[16]     In general, the target date funds rebalance their portfolios to become more conservative as the investor nears retirement.

[17]     Participants were advised that "Auto enrollees who have no investment allocations on file for future contributions will be defaulted into the Lifetime Income Strategy ('LIS')."  2019 SPD.  The Participants were further advised that "If you do not make an investment election, your Plan accounts will be automatically invested in the investment fund designated by the Committee for this purpose.  Currently the designated investment fund for this purpose is the Lifetime Income Strategy."  *Id.*

[18]     Participants were advised that "Unless you elect otherwise, any balances in the Retirement Strategies funds will automatically be transferred to the Lifetime Income Strategy . . . on October 17, 2014.  The Lifetime Income Strategy will become available as a new investment option in the [Plan] on Monday, October 20, 2014."  *Id.*

calendar year since 2010.  While the markets have charged ahead over the last five years, this series' asset base has nearly halved.'"  *Id.*

43.     Yet Defendants retained the poorly performing Retirement Strategies funds in the Plan for over five years, and then (instead of replacing these funds with a well-established investment series) Defendants once again put the Plan into an untested proprietary product, *i.e.*, the LIS (in October of 2014), to the detriment of the Plan and its participants.

44.     AllianceBernstein's decision to close and liquidate the Retirement Strategies "reflect[ed] the company's evolving target-date strategy that emphasizes using a multimanager approach, 'which we think is a better solution,' said Richard Davies, senior managing director for [AB] defined contribution."  Robert Steyer, *AllianceBernstein to close underperforming single-manager target-date series*, PENSIONS & INVESTMENTS (July 14, 2015).  Yet, by placing its own employees' retirement plan in the LIS (which replaced the Retirement Strategies), Defendants continued to keep the Plan in a single-manager target date-like series, managed only by Defendant AllianceBernstein because it was in their self-interest and not because doing so was in the best interest of the Plan's participants and beneficiaries.

45.     When making investment decisions, prudent fiduciaries of 401(k) plans, such as the Plan, should consider, among other things, the performance history, portfolio manager experience, and manager tenure of available investment alternatives.  A consistent performance history and investment strategy, among other factors, indicate the ability of the investment manager to generate investment results that consistently meet or exceed a given fund's benchmark(s).  Here, it was imprudent for Defendants to select and retain any investment options for the Plan, including the LIS, that lacked a part of, let alone all of, the relevant performance history one would expect the Plan's fiduciaries to assess here before adopting LIS as the Plan's default investment option.  At the time of their introduction to the Plan, the LIS funds had no performance history, and (as

discussed below) – as of March 31, 2022, three out of the seven LIS options have underperformed their stated benchmark since their inception.

46.     A brochure for the LIS, dated March 31, 2022 ("2022 LIS Brochure"), provides that AllianceBernstein can invest a given Participant's retirement savings in the LIS in up to seven component portfolios: (1) Stock Portfolio,[19] (2) Bond Portfolio,[20] (3) Diversifier Portfolio,[21] (4) Short Duration Portfolio, (5) Real Asset Portfolio,[22] (6) Volatility Management Portfolio,[23] and (7) Secure Income Portfolio.[24]  According to the brochure for LIS, dated March 31, 2021 ("2021 LIS Brochure"), "[e]ach component portfolio is a separate account that invests in a set of underlying investment components."[25]

47.     The performance of the LIS's respective portfolios is measured against the historical performance of various asset class indices such as the S&P 500 Index, the Barclays Global Aggregate Index, All Market Real Return Index, and others.

---

[19]     The Stock Portfolio "targets a mix of 40% U.S. large-cap stocks, 8% U.S. small/mid-cap stocks, 32% international stocks and 20% global stocks."  2021 LIS Brochure.

[20]     The Bond Portfolio "targets a mix of 65% global bonds and 35% U.S. TIPS."  *Id.*

[21]     The Diversifier Portfolio "invests in actively managed U.S. high-yield bonds . . . ."  *Id.*

[22]     "The real asset strategy is an actively managed global portfolio of 'real' assets (primarily real estate and commodities) that may opportunistically shift to additional inflation-sensitive assets, including U.S. Treasury Inflation-Protected Securities (TIPS) and foreign currencies."  *Id.*

[23]     The Volatility Management Portfolio "invests in global equities, global REITs, bonds and currencies.  The portfolio invests in both physical and derivative instruments, which include futures, options, swaps and forwards."  *Id.*

[24]     The Secure Income Portfolio invests "in a passive, index-managed fund composed of 50% stocks and 50% bonds."  *Id.*

[25]     As noted above, Plan documents provide that LIS may invest in a combination of investments chosen by AllianceBernstein, "including, but not limited to, collective trusts, mutual funds and separate accounts (collectively the 'Underlying Components')."  2020 Form 5500.  These Underlying Components "may include investments in the AB Collective Investment Trust Series (the 'Underlying Trusts')."  *Id.*

48.     The chart below indicates that since their inclusion in the Plan in October of 2014, the Plan's LIS investments have routinely produced substantially worse returns than their major peers.   In particular, during the Relevant Period, the LIS component portfolios (for which performance histories are available)[26] have consistently performed below their relevant benchmarks – which are AllianceBernstein's self-chosen benchmarks (according to the Plan's March 31, 2022 "ALLIANCEBERNSTEIN's 401(K) PLAN Disclosure of Plan Related Information").   By way of example, as indicated by the below chart, the Volatility Management Portfolio, Secure Income Portfolio, and the Real Asset Portfolio underperformed their respective benchmarks, measured for the first quarter of 2022, over a one-year period and since the LIS Fund's date of inception of October 17, 2014.

**As of March 31, 2022:**

|  | Performance for 1st Quarter of 2022 | 1-Year Performance History | Performance Since LIS Fund Date of Inception (10/17/14) |
|---|---|---|---|
| **Volatility Management Portfolio /LIS Component** | -5.21 | 9.16 | 8.49 |
| **AllianceBernstein's Custom Benchmark**[27] | -5.12 | 9.20 | 10.74 |
| **Secure Income Portfolio/LIS Component** | -5.32 | 2.18 | 5.77 |
| **AllianceBernstein's Custom Benchmark**[28] | -5.08 | 3.19 | 6.99 |

---

[26]     Notably, all of the LIS component portfolios lack a ten-year performance history.

[27]     Custom fixed-weight benchmark comprising 25.8% S&P 500 Index, 6.6% Russell 2500 Index, 21.6% MSCI ACWI ex USA Unhedged Index (net), 40% MSCI World Index, and 6% FTSE EPRA/NAREIT Developed Index.

[28]     Custom benchmark comprising 25% S&P 500 Index, 8% Russell 2000 Index, 17% MSCI EAFE Index, 30% Barclays US Aggregate Bond Index, and 20% Barclays US TIPS Index.

|  | Performance for 1st Quarter of 2022 | 1-Year Performance History | Performance Since LIS Fund Date of Inception (10/17/14) |
|---|---|---|---|
| **Real Asset/LIS Component** | 7.13 | 25.16 | 4.75 |
| **AllianceBernstein's Custom Benchmark**[29] | 9.18 | 27.04 | 4.96 |

49.     A prudent fiduciary, among other things, would have removed any LIS component investment after four consecutive calendar quarters of underperformance.  But that here did not happen.

50.     Here, three of the seven LIS investments underperformed their respective benchmarks for more than four consecutive calendar quarters, yet Defendant let those investments not only remain in the Plan, but serve as QDIA investments for the Plan.

51.     And measured as of 2019 – in other words, roughly at the midpoint of the proposed class period (the "Relevant Period") in this case – four of the seven LIS investments were underperforming their AllianceBernstein-designated benchmarks.  *See* AllianceBernstein 401(K) Plan Disclosure of Plan-Related Information (Dec. 31, 2019).  Yet, still, they remained in the Plan.

52.     Finally, leading money managers advise that decision makers should consider ten-year periods prior to investing, yet Defendants did not require so much as a one-year track record when it came to investing the Plan's retirement monies in the proprietary LIS investments – yet another indication that Defendants' fiduciary process here (if to call it such is *le mot juste*) is and was imprudent and disloyal.  *See* Troy Segal, *Measuring Portfolio Performance*, INVESTOPEDIA (Dec. 12, 2021), https://www.investopedia.com/articles/08/performance-measure.asp; *see also*

---

[29]     All Market Real Return Index composed of 30% Bloomberg Commodity Total Return Index, 30% FTSE EPRA/NAREIT Global Index, 20% MSCI ACWI Commodity Producers Index and 20% MSCI World Index.

*Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 133-34 (D. Mass. 2021) (denying motion to dismiss ERISA case concerning 401(k) plan investment options and noting "plaintiffs assert that the selection of the [investments at issue] was imprudent because, at the time they were selected, the funds had insufficient performance histories upon which they could be evaluated. Plaintiffs declare that a prudent fiduciary would not have selected investment options that completely lack performance histories, such as the [investments at issue] . . . .").

53.    All this time, while Defendants' fiduciary breaches were ongoing during the Relevant Period, there were numerous superior alternatives available to the Plan that consistently outperformed the LIS investments long before the LIS investments inception date.  The below chart indicates, by way of example, one such alternative target date fund's performance compared to the AB LIS investments:

| Inception Date | Fund Name | | | Return Since Inception | | Inception Date | Proprietary AB LIS Option | Return Since Inception |
|---|---|---|---|---|---|---|---|---|
| 8/15/2011 | Vanguard Target Retirement 2020 Trust Plus | | | 8.25% | | 10/17/2014 | AB LIS Short Duration Portfolio | 1.50% |
| 8/15/2011 | Vanguard Target Retirement 2025 Trust Plus | | | 9.93% | | 10/14/2014 | AB LIS Short Duration Portfolio | 1.50% |
| 8/15/2011 | Vanguard Target Retirement 2030 Trust Plus | | | 11.49% | | 10/17/2014 | AB LIS Bond Portfolio | 3.52% |
| 8/15/2011 | Vanguard Target Retirement 2035 Trust Plus | | | 7.64% | | 10/17/2014 | AB LIS Bond Portfolio | 3.52% |
| 8/15/2011 | Vanguard Target Retirement 2040 Trust Plus | | | 14.70% | | 10/17/2014 | AB LIS Diversified Portfolio | 6.34% |
| 8/15/2011 | Vanguard Target Retirement 2045 Trust Plus | | | 16.34% | | 10/17/2014 | AB LIS Volatility Management Portfolio | 9.61% |
| 8/15/2011 | Vanguard Target Retirement 2050 Trust Plus | | | 16.34% | | 10/17/2014 | AB LIS Volatility Management Portfolio | 9.61% |
| 11/30/2011 | Vanguard Target Retirement 2055 Trust Plus | | | 16.44% | | 10/17/2014 | AB LIS Stock Portfolio | 12.64% |
| 3/23/2012 | Vanguard Target Retirement 2060 Trust Plus | | | 16.61% | | 10/17/2014 | AB LIS Real Asset Portfolio | 3.92% |
| 8/15/2011 | Vanguard Target Retirement Income Trust Plus | | | 5.90% | | 10/17/2014 | AB LIS Secure Income Portfolio | 6.78% |
| | **Fee** | | | 0.055% | | | **Fee for LIS Secure Income Portfolio** | 1.00% |
| | | | | | | | * subtract the 1% fee for the LIS Secure Income Portfolio and the performance difference is .12% | |

54.    Defendants during the Relevant Period then had, yet better performing, non-proprietary target date fund alternatives to choose from for the Plan's investment menu.

55.    If Defendants had an appropriate fiduciary process in place here, they would have made different investment choices for the Plan that would not have resulted in undue losses and unjust profits.

56.     Exacerbating Defendants' imprudent and conflicted decision to select and retain the LIS investments is the fact that Defendants also chose these investments to serve as the Plan's QDIA immediately upon their addition to the Plan.  A 401(k) plan, such as the Plan, can designate one of its investment options as a QDIA to aid participants in the allocation of their retirement holdings.  If plan participants do not direct how their assets should be allocated, all contributions to their plan accounts will be automatically invested in the QDIA.  ERISA fiduciaries must make a prudent and loyal selection and, following that, retention of an appropriate QDIA for a given 401(k) plan.  Instead of choosing a target date fund with a long-standing performance history (in 2021, 86% of plans use a target date fund for their plan's QDIA),[30] the LIS investments that were launched in October of 2014 immediately became the Plan's QDIA (without having any prior performance history), making the impact of Defendants' imprudent and disloyal selection of the LIS investments particularly egregious.  No prudent fiduciary would subject participants to such untested investments to save for their retirement, let alone designate such investments as the default investment option for their 401(k) retirement plan.

57.     As noted above, the LIS includes an insurance feature (provided through multiple group insurance contracts), designed to provide Participants with an insured source of retirement income.[31]  This insurance feature comes at a cost to Participants.  In particular, according to the

---

[30]     *64th Annual Survey Report*, PLAN SPONSOR COUNCIL & AMERICA, https://www.psca.org/research/401k/64thAR (last accessed Nov. 15, 2022).

[31]     The LIS creates this income "by gradually moving [Participant's] [LIS] assets as [Participant] approach[es] retirement from 'nonsecure' investment portfolios (stocks, bonds and other investments) into a special portfolio backed by a group of insurance companies."  This latter portfolio is the Secure Income Portfolio of the LIS, and it is used to fund a given Participant's insured income during retirement that participating insurers will pay annually for the remainder of that Participant's lifetime or their spouse's lifetime "if [Participant's] Secure Income Portfolio account balance is exhausted because annual withdrawals of [Participant's] Secure Income Withdrawal Amount have depleted [the Participant's] account."  2019 SPD.  The Secure Income Withdrawal Amount is the amount of the insured annual income from the LIS which begins at retirement, and it is calculated according to a particular formula.  *Id.*

Plan's 2019 SPD, "if [a Participant's] [LIS] account is allocated to the Secure Income Portfolio (*as it would be if [Participant's] Secure Income Level[32] is greater than 0% and [Participant is] age 50 or over*), [Participant] will pay an insurance fee at an annual rate of 1% of [Participant's] Secure Income Portfolio account balance." *Id*. (emphasis added). The Plan's SPD further advises that "[l]ike any fee, the insurance fee will reduce the investment return of [Participant's] Secure Income Portfolio." *Id*. Participants are charged with this annual insurance fee when their Plan funds are allocated to the SIP (beginning at age 50 at the earliest). As the *New York Times* noted in an article examining LIS around the time of its inception, "'A 1 percent fee sounds relatively innocuous, but if you compounded it over 10 or 25 years, that is a great deal of money,' Mr. Webb said. '*The value of this thing only accrues to you if actually hold it until very advanced ages*.'" Tara Siegel Bernard, *A 401(k) that Promises Never to Run Dry*, N.Y. TIMES (Nov. 13, 2012), https://www.nytimes.com/2012/11/14/your-money/a-401-k-that-promises-income-for-life.html (quoting Anthony Webb, then a research economist at the Center for Retirement Research at Boston College) (emphasis added).

58.     As such, virtually every Participant whose retirement savings are invested in the LIS becomes subject to the annual insurance fee once reaching the age of 50 – which insurance fee is, among other things, roughly double the fee burden typically associated with retirement plan-suitable target date funds as to which the LIS investments are otherwise comparable.[33]

---

[32]     Secure Income Level is "the target percentage of [Participant's] Lifetime Income Strategy account – between 0% and 100% – that [Participant] want[s] allocated over time to the Secure Income Portfolio and used to fund [Participant's] Secure Income Withdrawal Amount." *Id*. The Plan's SPD further provides that "[t]he default Secure Income Level is 100%." *Id*.

[33]     According to the Plan's SPD, the LIS gradually allocates the Participant's assets into the SIP during the so-called "Transitioning" phase, which begins at age 50. *Id*. *See also* Tim Parker, *Is a Target-Date Fund the Best Choice?*, INVESTOPEDIA (Apr. 26, 2022), https://www.investopedia.com/retirement/targetdate-fund-best-choice/ (target date fund average expense ratio/fee burden is 0.51%.

59.     Based on the 2016 through 2021 Form 5500 filings, the participant account balances in the Secure Income Portfolio and fees Participants paid for investing in these newly established investments are as follows:

| Plan Year | Assets in Secure Income Portfolio with 1% Fee | Fees Paid |
|---|---|---|
| 2016 | $95,361,593 | $953,616 |
| 2017 | $113,456,885 | $1,134,569 |
| 2018 | $119,543,723 | $1,195,437 |
| 2019 | $145,400,372 | $1,454,004 |
| 2020 | $173,366,980 | $1,733,670 |
| 2021 | $213,895,078 | $2,138,951 |
| | **Total fees paid by Plan Participants:** | **$8,610,246** |

60.     Based on the foregoing, a prudent and unconflicted fiduciary in like circumstances would have made a different decision in selecting a target date suite of investment options for the Plan instead of choosing LIS.  For instance, the Vanguard Target Retirement Trust Plus Funds have a fee of .055%.  Participants defaulted in one of the Vanguard Target Retirement Trust Funds when they turned 50 instead of the AllianceBernstein LIS funds would have saved 0.945 cents for every dollar they invested for their retirement, or $8.1 million during the Relevant Period.

61.      Here, Defendants breached their duties of prudence and loyalty by selecting and maintaining the more expensive LIS investments despite numerous deficiencies that were evident during the Relevant Period, including these investments' partially or wholly lacking performance histories, continued failure to meet their designated benchmarks, and high insurance fees when superior alternatives were available in the marketplace.

### C.     Defendants Maintained the Plan's Investments in Other Poorly Performing AllianceBernstein Funds When Other Investment Vendors Offered Better-Performing Alternative Funds

62.     In addition to the LIS investments, Defendants also chose for the Plan to offer and retain numerous other AllianceBernstein-branded proprietary retirement investment options.  Specifically, according to the Plan's SPD, during the Relevant Period, the Plan also offered the following nine individual funds (together with AB Government Cash, "Core Investments"):

**Asset Allocation**

- AB Wealth Strategy – Appreciation

- AB Wealth Strategy – Balanced

- AB Wealth Strategy – Conservative

**Stocks**

- AB U.S. Strategic Equities

- AB International Strategic Equities

- AB Global Core Equity

- AB Global Real Estate Securities

**Bonds**

- AB U.S. Short Duration Plus

- AB Global Fixed Income

63.    As shown in the below chart and much as with the LIS investments, these AllianceBernstein Options have been poor performers, or had no existing performance when placed in the Plan, and for the most part, have continued to trail their self-identified performance benchmarks during the Relevant Period.

**Based on the ALLIANCEBERNSTEIN 401(K) PLAN Disclosure of Plan-Related Information dated June 2022, as of March 31, 2022:**

| | 1-Year Performance History | 3-Year Performance History | Inception Date |
|---|---|---|---|
| **AB Wealth Strategy – Appreciation/Asset Allocation Fund** | 7.55 | 13.57 | 8/30/2007 |
| ***AB Provided Benchmark:*** A customized benchmark that has the same target asset allocation as the Portfolio at all times and | 10.86 | 14.69 | N/A |

| | 1-Year Performance History | 3-Year Performance History | Inception Date |
|---|---|---|---|
| uses index returns to represent performance of the asset classes. The benchmark returns were calculated by weighting the monthly index returns of each asset class by the Portfolio's target allocation for each asset class. The Russell 3000 Index was used to represent the allocation to U.S. stocks, MSCI EAFE Index to represent non-U.S. stocks and 33% MSCI ACWI Commodity Producers Index, 33% FTSE EPRA NAREIT Global, 33% Bloomberg Commodity Total Return Index to represent real assets. | | | |
| **AB International Strategic Equities** | 0.72 | 6.66 | 03/02/201 8 |
| *AB Provided Benchmark:* MSCI AC World Ex-U.S. Index (Gross) | -1.04 | 8.01 | N/A |
| **AB Global Core Equity/Global Equity Fund** | 2.71 | 11.88 | 6/15/2015 |
| *AB Provided Benchmark: MSCI All Country World Index (Net)* | 7.28 | 13.75 | N/A |
| **AB U.S. Strategic Equities** | 14.79 | 18.17 | 3/2/2018 |
| *AB Provided Benchmark: S&P 500 Stock Index* | 15.65 | 18.92 | N/A |

64.     Had an appropriate fiduciary process been in place during the Relevant Period, the outcome for the Plan here would have been different.  The deficiency of AllianceBernstein's proprietary investments should have been evident to Defendants throughout the Relevant Period if a proper review of these funds' performance record had been conducted on a regular basis, as shown by the chart above.  Specifically, a prudent and unconflicted ERISA fiduciary would have taken corrective steps to monitor and remove such poorly performing funds from the Plan or replace them with investment options that demonstrated an ability to consistently meet or outperform their benchmark(s) at the time that fiduciary decisions should have been made to protect the Plan.  Defendants, however, did not do this.  This, too, harmed Plaintiffs and the other Participants, and supports a strong inference that Defendants failed to follow a prudent process in selecting and maintaining these and the Plan's other investments.

65.     Instead of abiding by their fiduciary mandate, throughout the Relevant Period, Defendants kept the Plan and its Participants invested in the poorly performing AllianceBernstein Options to serve the Partnership's corporate interests (as opposed to those of the Participants), all the while other 401(k) investors were exiting these funds or decreasing their holdings in these funds.  By way of example, each of the following AllianceBernstein proprietary investments had fewer companies maintaining their plan assets in that investment in 2021 than at the beginning of the Relevant Period:

| Alliance Bernstein Proprietary Fund | Investors in fund at the end of 2015 | Investors in fund at the end of 2021 |
|---|---|---|
| AB US Strategic Equities Collective Trust | 4 | 1 |
| AB Volatility Management Collective Trust | 3 | 2 |

66.     Another example of Defendants' imprudence is that at the end of 2018, the AB Domestic Passive Collective Trust offered in the Plan had four total retirement plan investors in

the fund; at the end of 2019, the same AB fund in the Plan had only two retirement plan investors in the fund; at the end of 2020, there was only one retirement plan investor remaining in the fund; and in 2021, Defendants added this fund to the Plan, even though other investors were fleeing the fund at the time.

67.    Not only did Defendants keep the Plan invested in the underperforming AllianceBernstein Options, while other fiduciaries were removing their plan investments from these very same funds, but as the below graphic further indicates, the AB Plan assets held in these imprudent investments represented an increasing percentage of those funds' Plan assets during the Relevant Period, to the Participants' detriment, as Defendants stood idly by, without taking any protective fiduciary action.

| AllianceBernstein Option | 2015[34] | 2021[35] |
|---|---|---|
| AB U.S. Strategic Equities Collective Trust | 67.5% | 100% |
| AB Volatility Management Collective Trust | 74% | 79% |

68.    As the above graphic indicates, instead of closely monitoring the Plan investments to make sure they continued to be prudent at all relevant times, Defendants disloyally kept the Plan invested in the persistently underperforming AllianceBernstein Options and even allowed the Plan to increase its position in these imprudent holdings during the Relevant Period to bolster the Company's revenue from its investment management business – all of this while other retirement plans were exiting these funds.  A prudent fiduciary in like circumstances would have made a different decision in selecting investments for its retirement plan when, as here, better performing analogous investments were available.

---

[34]    The number in this column represents the percentage of the given fund's total assets under management that was comprised of Plan assets in 2015.

[35]    The number in this column represents the percentage of the given fund's total assets under management that was comprised of Plan assets in 2020.

By way of further example of Defendants' disloyalty and imprudence, Defendants added the AB Global Core Equity Collective Trust to the Plan in 2015, even though that fund did not even exist prior to 2015.[36]

In 2015, the AB International Strategic Equities Collective Trust was created for another investor. In 2018, without any long-term performance history, Defendants added a new share class of this fund and placed it into the Plan.

Just recently, Defendants added the AB US High Yield Collective Trust to the Plan in 2021, even though that fund did not exist prior to 2021. Defendants made these additions to serve the Partnership's business interests, by using Plan assets as seed money for these newly created and untested proprietary funds. No prudent fiduciary would subject participants to such untested funds to save for his or her retirement. As such, in disregard of basic procedural norms requiring fiduciaries to consider a fund's performance record before including and retaining that fund, Defendants not only used Plan assets to sustain the Partnership's investment management business and resultant revenue in order to make up for the loss of other investors, but they also used the Plan assets as seed money to promote the Partnership's proprietary investments. ERISA flatly prohibits this kind of conflicted fiduciary conduct. *See, e.g.*, *Miller v. Astellas US LLC*, No. 20 C 3882, 2021 WL 1387948, at *2 (N.D. Ill. Apr. 13, 2021) (denying in part dismissal motion concerning similar proprietary fund-based ERISA fiduciary lawsuit where "Plaintiffs allege that it was imprudent and disloyal to select the Aon CITs and retain them in the Plan because, at the time they were added to the Plan, Aon had limited investment-management experience, the Aon CITs had a 'limited performance history of less than three years,' and during that limited history, they had underperformed their benchmarks and the comparable mutual funds that were replaced by the

---

[36]     Just prior to the start of the Relevant Period, Defendants added the AB All Market Real Return Collective Trust to the Plan in 2014, even though that fund did not exist prior to 2014.

Aon CITs; after the Aon CITs were included in the Plan, they continued to substantially underperform comparable funds; and Aon had a conflict of interest because it had a duty to act in the exclusive best interest of Plan participants yet also sought to benefit itself by causing the Plan to invest in its own funds, thus increasing its business and revenues.").

All this time, while Defendants' fiduciary breaches were ongoing during the Relevant Period, the AllianceBernstein funds were underperforming both competitor fund families and applicable benchmarks.  The below charts indicate, by way of example, such underperformance:

| | | 10 year return |
|---|---|---|
| **AB Proprietary Fund** | AB Wealth Strategy: Appreciation/Asset Allocation Fund | 13.26% |
| Alternative Investment | Blackrock Russell Large Cap Index Fund | 16.42% |
| Alternative Investment | Vanguard Russell 3000 Index Fund | 25.56% |
| | | |
| **AB Proprietary Fund** | AB Domestic Passive Collective Trust | N/A |
| Alternative Investment | Federated Opportunistic High Yield Bond Fund | 4.92% |
| Alternative Investment | Vanguard High Yield Corporate Admiral | 4.08% |
| | | |
| **AB Proprietary Fund** | AB International Strategic Equities | N/A |
| Alternative Investment | Vanguard Total Internatioal Stock Index | 5.03% |
| Alternative Investment | SEI Screened World Equity Ex-US | 6.86% |

| As of 12/31/2021 | | |
|---|---|---|
| | | **Performance since inception date of March, 2nd, 2018** |
| **AB Proprietary Fund** | AB International Strategic Equities | 4.48% |
| **AB Provided Benchmark** | MSCI AC World Ex-US Index | 6.73% |
| | | **Performance since inception date of February 2, 2021** |
| **AB Proprietary Fund** | AB Domestic Passive Collective Trust | 23.50% |
| **AB Provided Benchmark** | S&P 500 Stock Index | 23.59% |
| | | **Performance since inception date of August 31, 2007** |
| **AB Proprietary Fund** | AB Wealth Strategy: Appreciation/Asset Allocation Fund | 7.51% |
| **AB Provided Benchmark** | AB's Provided Customized Benchmark* | 7.87% |
| | *Customized benchmark that has the same target asset allocation as the Portfolio at all times and uses index returns to represent performance of the asset classes. The benchmark returns were calculated by weighting the monthly index returns of each asset class by the Portfolio's target allocation for each asset class. The Russell 3000 Index was used to represent the allocation to US stocks, MSCI EAFE Index to represent non-US stocks and 33% MSCI ACWI Commodity Producers Index, 33% FTSE EPRA NAREIT Global, 33% Bloomberg Commodity Total Return Index to represent real assets. | |

69.     As such, before and during the Relevant Period, Defendants had a number of substantially identical, yet better performing fund alternatives to choose from for the Plan's investment menu, but Defendants chose instead to offer only the AB Proprietary funds, costing Participants over $75 million in these three funds alone during the Relevant Period.  If Defendants had an appropriate fiduciary process in place, as is required for non-conflicted fiduciaries to satisfy their duties of prudence and loyalty, they would have made different investment choices for the Plan, that would not have resulted in undue losses and unjust profits.

## VI.     DEFENDANTS' BREACHES OF DUTY CAUSED MILLIONS OF DOLLARS IN LOSSES TO THE PLAN AND ITS PARTICIPANTS

70.     The rampant conflicts of interest and breaches of the duty of loyalty described above violate ERISA and mandate disgorgement of fees and other profits wrongfully obtained

directly or indirectly, as a result of the Defendants' fiduciary breaches and violations of prohibited transactions during the Relevant Period, even if the Plan and Participants had not suffered investment losses.  But the Plan and Participants did suffer such losses.

71.     Due to the AllianceBernstein Options' poor performance and insurance related fees in their LIS options, the Plan has suffered millions of dollars a year in losses during the Relevant Period because Defendants failed to remove or replace the AllianceBernstein Options as Plan options, thereby causing the Plan to invest billions of dollars in these investments over the Relevant Period.  This directly resulted in improperly low investment returns for the Plan.

72.     Throughout the Relevant Period, Defendants did not consider or act in the best interest of the Plan and its Participants.  Rather, Defendants put their own interests before those of their fiduciary wards by treating the Plan's investments as a means to prop up the Company's underperforming investment management business (which, *inter alia*, was losing other 401(k) investors and trailing far behind its competitors, such as Vanguard[37] while Defendants were imprudently and disloyally keeping the Plan invested in AllianceBernstein's proprietary funds), and bolster the Company's business outlook and reputation.

73.     Thus, instead of acting in the Participants' best interests, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to AllianceBernstein and to generally promote AllianceBernstein's business interests to the detriment of the Plan and its Participants.  Defendants accomplished this by loading the Plan with AllianceBernstein Options, despite the fact that Participants would have been better served by being able to choose better

---

[37]     For example, the Plan is only one of 10 plans with over $1 billion in assets that have ***any*** AllianceBernstein funds in their plans.  By comparison, AllianceBernstein's competitor and a superior target date fund provider, Vanguard, boasts over 175 retirement plans with over $1 billion in plan assets that have the Vanguard target date funds in their plans.

performing investment options managed by unaffiliated companies, that were readily available to the Plan, with its significant bargaining power, at all relevant times.

74.     Yet Defendants' self-serving conduct enabled the Company to prop up its investment management business, thereby increasing its visibility and improving its prospects in the asset management marketplace, ultimately bolstering the Partnership's bottom-line, market value, and business opportunities at the expense and to the detriment of the Plan.  In effect, Participants (and their hard-earned retirement investments) were used as a captive investor base to effectuate AllianceBernstein's self-serving business strategies that ran counter to the Participants' interests.  As a result of Defendants' blatant self-dealing, the Plan-related investment decisions undertaken by Defendants during the Relevant Period, or their failure to act to protect the Plan, were imprudent and disloyal, and furthermore resulted in prohibited transactions under ERISA.

75.     The damages suffered by the Plan due to its above-described, imprudent investment in the Plan's LIS SIP investments alone amount to over $17 million in investment performance over the Relevant Period, as compared to, for instance, low-cost, better-performing investment options.

76.     Collectively, the underperformance of the AllianceBernstein Options *other than* the LIS investments cost Participants over $45 million in earnings during the Relevant Period.

**VII.   PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND RELATED FACTS UNTIL SHORTLY BEFORE FILING THIS COMPLAINT**

77.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and recordkeeping services selections of fiduciaries of similar plans, the costs of the Plan's investments compared to those of similarly sized plans, the availability of superior investment options, or the costs of the Plan's administrative and recordkeeping services compared to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before

this suit was filed via the investigation of their counsel.  Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's service providers), because this information is solely within the possession of Defendants prior to discovery.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## VIII.   ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

78.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  ERISA §404(a), 29 U.S.C.§1104(a)(1), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)   for the exclusive purpose of
>
>> (i)   providing benefits to participants and their beneficiaries; and
>>
>> (ii)   defraying reasonable expenses of administering the plan;
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C)   by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

79.   ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  ERISA §405, 29 U.S.C. §1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of

fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2)    if, by his failure to comply with section 404(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

80.    Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers.  As the Department of Labor explains:

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan.  [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DoL Ad. Op. No. 88-16A.

81.    Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding . . . which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

82.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives.  Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

83.     The Department of Labor counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable."  After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.
>
> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not.  Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement.  Others charge separately for individual services.  Compare all services to be provided with the total cost for each provider.  Consider whether the estimate includes services you did not specify or want.  Remember, all services have costs.
>
> Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan.  For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services.  There also may be sales and other related charges for investments offered by a service provider.  Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities*, U.S. DEPARTMENT OF LABOR (May 2004), https://web.archive.org/web/20040603062416/http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

84.     In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

*      *      *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees & Expenses* (May 2004), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

85.     A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by plan documents to do so.

86.     ERISA prohibits certain transactions with plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA §406, 29 U.S.C. §1106(a)-(b), provides as follows:

(a) Transactions between plan and party in interest.

35

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## IX. CLASS ALLEGATIONS

87. Plaintiffs bring this action on behalf of a proposed class defined as:

> All Participants who invested in the Plan from December 14, 2016 to the present.  Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

88.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(1), (b)(2), and/or (b)(3).

89.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.  The Plan had 5,289 Participants with account balances at the end of the 2019 plan year, all of whom invested in the Plan during the Relevant Period.  The number of class members is so large that joinder of all its members is impracticable.

90.     Common questions of law and fact include:

A.  Whether Defendants failed to engage in a proper selection and monitoring process with regard to the Plan investments;

B.  whether Defendants improperly caused the Plan to invest its assets in imprudent funds to the exclusion of other available alternatives;

C.  whether Defendants breached their fiduciary duties to the Plan by causing the Plan to invest its assets in imprudent funds;

D.  whether the investment decisions made by Defendants were the result of their failure to make those decisions free of any conflicts and solely in the interests of Participants;

E.  whether Defendants breached their fiduciary duties to the Plan by not properly reviewing the administrative fees associated with the Plan's Mutual Fund Window; and

F.  whether the Plan suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions, and if so, the amount of those losses,

or undue profits to be disgorged as a result of the fiduciary misconduct alleged herein.

91.     Plaintiffs' claims are typical of the claims of the class.  Plaintiffs have no interests that are antagonistic to the claims of the class.  Plaintiffs understand that this matter cannot be settled without the Court's approval.  Plaintiffs are not aware of another suit pending against Defendants arising from the same circumstances.

92.     Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs are committed to the vigorous representation of the class.  Plaintiffs' counsel are experienced in class action and ERISA litigation.

93.     A class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the class is impracticable.  The losses suffered by some of the individual members of the class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all class members similarly as Participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.  Plaintiffs are unaware of any difficulty in the management of this action as a class action.

94.     This Class may be certified under Rule 23(b).

A.     23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants opposing the class, or (B) adjudications with respect to individual members of

the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.      23(b)(2).  This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class.

C.      23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

## X.   CLAIMS FOR RELIEF

### COUNT I
**BREACH OF DUTIES OF PRUDENCE AND LOYALTY**
**AGAINST DEFENDANT ALLIANCEBERNSTEIN, ADMINISTRATIVE COMMITTEE DEFENDANTS,**
**AND INVESTMENT COMMITTEE DEFENDANTS**
**(Violation of 29 U.S.C. §1104(a)(1)(A)–(B))**

95.      As alleged above, Defendant AllianceBernstein, the Administrative Committee Defendants, and the Investment Committee Defendants (collectively, "Count I Defendants") are fiduciaries with respect to the Plan and as such, are subject to ERISA's fiduciary duties.

96.      29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Count I Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments.

97.     Count I Defendants breached these fiduciary duties by engaging in the conduct described herein.  Among other things, these Defendants failed to employ a prudent and loyal process for selecting and monitoring the Plan's investment options by improperly prioritizing AllianceBernstein's proprietary investments over superior available options, and by failing to critically or objectively evaluate the performance of the Plan's proprietary investments in comparison to other investment options.

98.     Instead of acting in the best interests of Participants, the conduct and decisions of Defendants named in this Count were driven by their desire to drive revenues and profits to AllianceBernstein and to generally promote AllianceBernstein's business interests.  Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the Participants' interests, and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

99.     Further, each of the actions and omissions described above and elsewhere in this Complaint demonstrates that Count I Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. §1104(a)(1)(B).

100.    As a consequence of Defendants' fiduciary breaches, the Plan and its Participants suffered millions of dollars in losses during the Relevant Period.

101.    Count I Defendants are liable under 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3) to make good to the Plan all losses resulting from the aforementioned fiduciary

breaches, to restore to the Plan any unjust profits obtained through the use of Plan assets and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT II
### BREACH OF DUTY TO MONITOR FIDUCIARIES
### AGAINST DEFENDANT ALLIANCEBERNSTEIN COMPENSATION COMMITTEE DEFENDANTS

102.    As alleged throughout the Complaint, Defendant AllianceBernstein and the Compensation Committee Defendants (collectively, "Count II Defendants" or "Monitoring Defendants") are fiduciaries of the Plan and as such, are subject to ERISA's fiduciary duties.

103.    In addition to its duties as the Plan Administrator, Defendant AllianceBernstein, through its Board of Directors, has the overall oversight responsibility for the Plan.  The Compensation Committee Defendants are charged with, *inter alia*, overseeing the Company's benefit plans, including the Plan, as well as with appointing members of the Administrative and Investment Committees of the Plan and reviewing the reports of these Committees.

104.    Given that the Monitoring Defendants have overall oversight responsibility for the Plan, and the specific responsibility to appoint and remove members of the Administrative Committee, these Defendants have a fiduciary responsibility to monitor the performance of the Administrative Committee and its members, and to ensure that they are complying with ERISA's statutory standards.  29 C.F.R. §2509.75-8 (FR-17).  Likewise, the Monitoring Defendants have a fiduciary responsibility to monitor the performance of the Investment Committee and its members, and to ensure that they are also complying with ERISA.  *Id*.

105.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and its participants when the monitored fiduciaries are not meeting their fiduciary obligations.

106.     To the extent that the Monitoring Defendants' fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

107.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

a.      failing to monitor and evaluate the performance of the Administrative and the Investment Committees, or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Defendants' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor the fiduciary processes of the Administrative and the Investment Committees, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c.      failing to remove members of the Administrative Committee or the Investment Committee, whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments within the Plan, and engaging in transactions prohibited under ERISA, all to the detriment of the Plan and Participants' retirement savings.

108.     As a consequence of the foregoing breaches of the duty to monitor, the Plan and its Participants suffered millions of dollars of losses during the Relevant Period due to unreasonable fees and investment underperformance.

109.     Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), the Monitoring Defendants are liable to restore to the Plan all losses suffered as a result of their failure to properly monitor other Plan fiduciaries as set forth herein, to restore to the Plan any unjust profits obtained

through the use of Plan assets, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT III
### PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST
### AGAINST ALL DEFENDANTS
### (Violation of §406(a)(1) of ERISA, 29 U.S.C. §1106(a)(1))

110.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

111.    As the Plan sponsor and a service provider for the Plan, AllianceBernstein (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

112.    Under ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

113.    Under ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

114.    Here, in violation of §406(a)(1)(C)-(D), 29 U.S.C. §1106(a)(1)(C)-(D), Defendant-fiduciaries caused the Plan to offer and to continue offering proprietary AllianceBernstein investment options that enabled the Partnership to bolster its investment management business and seed that business with Plan assets, in furtherance of AllianceBernstein's corporate strategy and business opportunities, thereby profiting the Partnership, as opposed to advancing the interests of the Plan.  By selecting and retaining AllianceBernstein Options, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders.  Defendants caused the Plan to engage in these

prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest, and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

115.    Furthermore, during the Relevant Period, Defendant-fiduciaries caused the Plan to invest in AllianceBernstein Options to develop and sustain the Company's investment management business (including by using Plan assets as seed money for newly launched proprietary funds), even as other investors were exiting or decreasing their holdings in AllianceBernstein Options.  Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

116.    As detailed above, Defendants maintained numerous AllianceBernstein Options in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions.

117.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable fees and expenses, thereby resulting in millions of dollars in losses to the Plan and its Participants, and/or unjust profits for the benefit of the parties in interest, earned not only through the receipt and collection of the fees stemming from the Plan's proprietary investments, but also through the use of Plan assets invested in AllianceBernstein Options to develop and sustain the Partnership's investment management business during the Relevant Period.

118.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all

the unjust profits obtained in violation of 29 U.S.C. §1106(a)(1) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

### COUNT IV
PROHIBITED TRANSACTIONS WITH FIDUCIARIES
AGAINST ALL DEFENDANTS
(Violation of §406(b) of ERISA, 29 U.S.C. §1106(b))

119.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

120.    As alleged herein, Defendant AllianceBernstein is a fiduciary of the Plan within the meaning of 29 U.S.C. §§1002(21) and 1106(b)(1).

121.    As alleged above, Defendant Compensation Committee and its members are fiduciaries of the Plan within the meaning of 29 U.S.C. §§1002(21) and 1106(b)(1).

122.    As alleged herein, Defendants Administrative and Investment Committees and their respective members are fiduciaries of the Plan within the meaning of 29 U.S.C. §§1002(21) and 1106(b)(1).

123.    Under ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

124.    Under ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

125.    Under ERISA §406(b)(3), 29 U.S.C. §1106(b)(3), a fiduciary shall not receive any consideration for his personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

126.    Throughout the Relevant Period, AllianceBernstein dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable direct or indirect fees to

the Partnership or its subsidiaries, but also profited from the development of its investment management business due to the Plan's investment in AllianceBernstein Options, including the Plan assets used to seed the Partnership's untested proprietary funds, in violation of 29 U.S.C. §1106(b)(1).

127.    Throughout the Relevant Period, the Compensation, Administrative and Investment Committee Defendants dealt with the assets of the Plan in their own interest when they caused the Plan to pay unreasonable direct or indirect fees to the Partnership or its subsidiaries and used the Plan to develop the Partnership's investment management business due to the Plan's investment in AllianceBernstein Funds, including the Plan assets used to seed the Partnership's untested proprietary funds, in violation of 29 U.S.C. §1106(b)(1).   Upon information and belief, every member of the Compensation, Administrative, and Investment Committees was an AllianceBernstein director or executive, whose compensation and promotion levels increased when he or she acted to increase revenue for the Partnership and to bring about further business opportunities for the Partnership.

128.    Throughout the Relevant Period, Defendants named in this Count, acting on behalf of the Partnership, whose corporate interests were adverse to those of the Plan and its Participants, in transactions involving the Plan, violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain AllianceBernstein Options that not only generated unreasonable revenue for the Partnership or its subsidiaries, but also enabled the Partnership to develop and sustain its investment management business in furtherance of its business ventures and opportunities to the detriment of the Plan and its Participants.

129.    Throughout the Relevant Period, AllianceBernstein received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of 29 U.S.C. §1106(b)(3).   Additionally, these transactions took place during the

Relevant Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investments in AllianceBernstein Options.

130.    Based on the foregoing facts, Defendants, each a fiduciary of the Plan, violated 29 U.S.C. §1106(b).  These prohibited transactions took place on an ongoing basis throughout the Relevant Period when AllianceBernstein or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of AllianceBernstein's investment management business due to the inclusion of the AllianceBernstein Options in the Plan.

131.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid unreasonable fees and expenses, in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its Participants, and/or unjust profits to the Plan fiduciaries.

132.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(b) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

### COUNT V
### CO-FIDUCIARY LIABILITY
### AGAINST ALL DEFENDANTS
### (Violation of §405(a) of ERISA, 29 U.S.C. §1105(a))

133.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

134.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability, which it may have under any other provision of ERISA, if:

    1)   it participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

2)  by its failure to comply with ERISA §404(a)(1) in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

3)  it knows of a breach by another fiduciary and fails to make reasonable efforts to remedy the breach.

135.    Defendants were all fiduciaries of the Plan within the meaning of ERISA §405(a), 29 U.S.C. §1105(a).

136.    Each Defendant knew of each breach of fiduciary duty by the other Defendants alleged herein, arising out of the imprudent and disloyal management of the Plan's investments and the prohibited transaction violations that took place during the Relevant Period.  Yet, Defendants knowingly participated in these fiduciary breaches and prohibited transactions, breached their own duties, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy such other fiduciary breaches and prohibited transactions.

137.    As some, if not all of the members of the Compensation, Administrative, and Investment Committees were officers, directors, or employees of the Partnership, their knowledge is imputed to Defendant AllianceBernstein.  Defendant AllianceBernstein knew of the breaches of fiduciary duty and prohibited transactions by each of the other Defendants arising out of the imprudent and disloyal management of the Plan's investments and the prohibited transaction violations that took place during the Relevant Period.  Yet, Defendant AllianceBernstein knowingly participated in these fiduciary breaches and prohibited transactions, breached its own duties to the Plan, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy these fiduciary breaches and prohibited transactions.

138.    As a direct and proximate result of these co-fiduciary violations by Defendants, the Plan and its Participants suffered millions of dollars in losses during the Relevant Period.

139.     Defendants are liable under 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3) to make good to the Plan all losses resulting from the aforementioned co-fiduciary violations and restore to the Plan any unjust profits obtained through the use of Plan assets and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     A declaration that the Count I Defendants breached their fiduciary duties of prudence and loyalty under ERISA;

B.     A declaration that Count II Defendants breached their fiduciary duty to monitor under ERISA;

C.     A declaration that the Defendants violated ERISA §406 and participated in prohibited transactions;

D.     An order compelling the disgorgement of all unjust profits incurred, directly or indirectly, as a result of the Defendants' violations of ERISA;

E.     An order compelling the Defendants to restore all losses to the Plan arising from the Defendants' violations of ERISA;

F.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

G.     Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in AllianceBernstein Options and any other imprudent investments;

H.      An order certifying this action as a class action, designating the class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

I.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.      An order awarding Plaintiffs and the class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

K.      An order awarding such other and further relief as the Court deems equitable and just.

DATED:  December 14, 2022                    SCOTT+SCOTT ATTORNEYS AT LAW LLP


                                             _s/ Tanya Korkhov_
                                             Tanya Korkhov (Atty Bar No. 4413472)
                                             The Helmsley Building
                                             230 Park Avenue, 17th Floor
                                             New York, NY 10169
                                             Telephone: 212-223-6444
                                             Facsimile:  212-223-6334
                                             tkhorkov@scott-scott.com

                                             Garrett W. Wotkyns
                                             8068 East Del Acero Drive
                                             Scottsdale, AZ 85258
                                             Telephone: 480-889-3514
                                             gwotkyns@scott-scott.com

                                             PEIFFER WOLF CARR KANE
                                             CONWAY & WISE, LLP
                                             Daniel J. Carr
                                             Jamie L. Falgout
                                             1519 Robert C. Blakes Sr. Drive
                                             New Orleans, LA 70130
                                             Telephone: 504-523-2434
                                             dcarr@peifferwolf.com
                                             jfalgout@peifferwolf.com

                                             *Counsel for Plaintiffs*