UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

                           :

DONALD S. BLOOM, DAVID C. GREENFIELD,   :
DAMIAN L. SMIKLE and JUSTIN A. STERNHELL, on  :
Behalf of the Profit Sharing Plan for Employees of   :
AllianceBernstein L.P., Themselves, and All Others  :
Similarly Situated,   :

                           :

                Plaintiffs,   :

                           :

          -v-   :

                           :

ALLIANCEBERNSTEIN L.P., COMPENSATION AND :
WORKPLACE PRACTICES COMMITTEE OF   :
ALLIANCEBERNSTEIN CORPORATION, RAMON   :
DE OLIVEIRA, PAUL L. AUDET, DANIEL G. KAYE, :
KRISTI MATUS, MARK PEARSON, BERTRAM L.  :
SCOTT, TARA THOMPSON POPERNIK, DANIEL  :
LOEWY, ADMINISTRATIVE COMMITTEE,   :
INVESTMENT COMMITTEE, and JANE and JOHN  :
DOES 1-20,   :

                           :

                Defendants.   :

                           :

---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _03/25/2024_

22-cv-10576 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Defendants AllianceBernstein L.P. ("AllianceBernstein" or the "Company"),

Compensation and Workplace Practices Committee of AllianceBernstein Corporation (the

"Compensation Committee"), Ramon de Oliveira, Paul L. Audet, Daniel G. Kaye, Kristi Matus,

Mark Pearson, Bertram L. Scott, Tara Thompson Popernik, Daniel Loewy, the Administrative

Committee of the Profit Sharing Plan for Employees of AllianceBernstein L.P. (the "Plan

Administrative Committee"), and the Investment Committee of the Profit Sharing Plan for

Employees of AllianceBernstein L.P. (the "Plan Investment Committee" and collectively, the

"Defendants"), move for an order, pursuant to Federal Rule of Civil Procedure 12(b)(6),

dismissing the amended complaint (the "Amended Complaint") in this action.  Dkt. No. 26.

Plaintiffs Donald S. Bloom, David C. Greenfield, Damian L. Smikle, and Justin A. Sternhell bring claims on behalf of themselves, the Profit Sharing Plan for Employees of AllianceBernstein L.P., and all others similarly situated (collectively the "Plaintiffs"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for: (i) breach of the duties of prudence and loyalty against AllianceBernstein, the Administrative Committee, and the Investment Committee, Dkt. No. 19 ¶¶ 100–06; (2) breach of the duty to monitor fiduciaries against the Compensation Committee, *id.* ¶¶ 107–14; (3) prohibited transactions with a party in interest against all Defendants, *id.* ¶¶ 115–23; (4) prohibited transactions with fiduciaries against all Defendants, *id.* ¶¶ 124–37; and (5) co-fiduciary liability against all Defendants, *id.* ¶¶ 138–44.

For the following reasons, the motion to dismiss is granted.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of the Amended Complaint as supplemented by the documents incorporated by reference. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp.3d 366, 382–83 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).[1]

---

[1] "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Although courts generally do not look beyond the facts stated on the face of the complaint, "'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inv. v. Sum Holding*, 949 F.2d 42, 47–48 (2d Cir. 1991)). "As a necessary corollary to the foregoing principles, a plaintiff cannot avoid judicial consideration of a document upon which it bases its complaint by the expedient refusal to attach it to the pleading or refer to it *in haec verba*." *Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y. Sept. 20, 2021). "Where a plaintiff has 'reli[ed] on the terms and effect of a document in drafting the complaint,' and that document is thus 'integral to the complaint,' we may consider

Plaintiffs Donald S. Bloom, David C. Greenfield, Damian L. Smikle, and Justin A. Sternhell are participants in the Profit Sharing Plan for Employees of AllianceBernstein, otherwise known as the AllianceBernstein 401(k) Plan (the "Plan"), and bring this action on behalf of themselves, all others similarly situated, and the Plan.  Dkt. No. 19 ¶ 1, 8–11. Defendant AllianceBernstein is a Delaware corporation with a corporate office in New York City that provides investment management and research services.  *Id.* ¶ 12.  AllianceBernstein is the Plan Sponsor and the Plan Administrator, and in those capacities, has discretionary authority or control over the administration and management of the Plan and the Plan assets.  *Id.*  Defendant Compensation Committee oversees the compensation and compensation-related matters of AllianceBernstein, including by appointing and monitoring members of the Plan's Administrative and Investment Committees.  *Id.* ¶ 13.  Defendant Plan Administrative Committee is comprised of senior officers and employees of AllianceBernstein that manage and administer the Plan and have discretionary authority or control over the assets of the Plan.  *Id.* ¶ 14.  Defendant Plan Investment Committee is also composed of senior officers and employees

---

its contents even if it is not formally incorporated by reference."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (alteration in original).  "Th[is] exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted).

Although Plaintiffs did not attach the 2019 Profit Sharing Plan for Employees of AllianceBernstein L.P. Summary Plan Description ("SPD") to the Amended Complaint, the Amended Complaint makes clear, definite, and substantial reference to the document.  There is no dispute as to the authenticity of the document as offered by Defendants, Dkt. No. 28-1, and it is thereby incorporated into the Amended Complaint by reference.  *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *20 (S.D.N.Y. Sept. 30, 2022) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019))).  The Court is thus permitted to consider the entirety of the documents, including portions not quoted in the complaint, in deciding the motion to dismiss.

of AllianceBernstein and also manages and administers the Plan. *Id.* ¶ 15.[2]  In summary, the

Plan is operated by the Plan Administrative Committee and the Plan Investment Committee, each

of which is comprised of individuals nominated by the Compensation Committee. *Id.* ¶ 22.

The Plan permits each participant to establish an individual account, which is funded by

the participant's contributions to the account. *Id.* ¶ 19.  As of December 31, 2023, the Plan had

5,560 participants with account balances, and total assets valued at approximately

$1,542,419,287. *Id.* ¶¶ 20–21.  At all times relevant to this action, Plan participants were able to

direct the Plan to purchase only those investments that were available under the Plan. *Id.* ¶ 23.

Among the investment options available to Plan participants were the Lifetime Income Strategy

("LIS"), the Customized Retirement Strategy ("CRS"), the Collective Investment Trust ("CIT"),

and a government securities portfolio ("AB Government Cash") that invests primarily in short-

term securities issued or guaranteed by the U.S. Government. *Id.* ¶ 24.  The 2021 Form 5500 for

the Plan makes clear that AllianceBernstein acts as the investment advisor for Plan investments,

and that "[w]ith the exception of the mutual funds, all Plan investments are managed by

[AllianceBernstein] and are therefore considered to be party-in-interest transactions." *Id.* ¶ 27.

With the exception of the government cash portfolio, and a "brokerage-window" featuring a

selection of investment funds managed by firms other than AllianceBernstein built into the Plan,

the Plan offered its participants only investment options developed and managed by

AllianceBernstein. *Id.* ¶ 34 & n.18.

---

[2] Defendant Popernik, the Director of Research for the Wealth Strategies Group of
AllianceBernstein, Dkt. No. 19 ¶ 15 n.9, and Defendant Loewy, the Chief Investment Officer and
Head of Multi-Asset and Hedge Fund Solutions of AllianceBernstein, *id.* ¶ 15 n.10, are members
of the Plan Investment Committee.

The LIS, which AllianceBernstein began to offer in October 2014 and which became the

Plan's qualified default investment alternative ("QDIA"),[3] is an "age-based asset-allocation

investment" vehicle.[4]  *Id.* ¶ 41.  In other words, the LIS creates a custom asset allocation strategy

for each Plan participant based on the participant's projected retirement date.  *Id.*; *see also* Dkt.

No. 28-1 at ECF p. 54 ("[T]he Lifetime Income Strategy establishes a diversified mix of stocks,

bonds, and other investments and automatically adjusts your portfolio to maintain an appropriate

asset allocation as you age.").  The March 2022 brochure for the LIS (the "2022 LIS Brochure")

explains that LIS is comprised of seven component portfolios, featuring a variety of asset classes

with varying risk and return profiles, that are custom-weighted for a plan Participant based upon

that participant's age in order to ensure that the participant achieves stable lifetime income after

retirement.  Dkt. No. 19 ¶ 46.  Although the default asset allocation is created based upon the

participant's age, participants can change the allocation settings if they desire.  Dkt. No. 28-1 at

ECF p. 55.  The performance of the component portfolios can be measured against the historical

performance of various asset classes such as the S&P 500 Index.  Dkt. No. 19 ¶ 47.  As of the

end of 2019, roughly the midpoint of the period relevant to this action, four of the seven LIS

component portfolios were underperforming the benchmarks designated for them by

AllianceBernstein; those components were not, however, removed from the Plan.  *Id.* ¶ 51.  As

---

[3] Throughout the period relevant to this action, LIS was the Plan's QDIA, meaning that Plan
participants with "no investment allocations on file for future contributions" were "defaulted into
the Lifetime Income Strategy . . . ."  Dkt. No. 19 ¶ 25 (quoting Dkt. No. 28-1 at 8); *see also id.*
¶ 56 ("If Plan participants do not direct how their assets should be allocated, all contributions to
their plan accounts will be automatically invested in the QDIA.").
[4] The LIS replaced Retirement Strategies, another AllianceBernstein proprietary investment
series established in 2008 and, shortly after its replacement as QDIA by LIS, eliminated
altogether in 2015.  *Id.* ¶ 42.  In late 2014 and early 2015, Morningstar gave the Retirement
Strategies a negative rating.  *Id.*  Even so, Defendants replaced Retirement Strategies with the
LIS, another of its proprietary investment strategies that it alone managed.  *Id.*

of March 2022, three of seven LIS components have underperformed their stated benchmark since their inception.  *Id.* ¶ 45; *see also id.* ¶ 50.

Participants can also purchase an insurance feature by choosing to allocate their funds in their LIS account to one of the seven component portfolios, the Secure Income Portfolio ("SIP"). *Id.* ¶ 26.  The insurance feature, which is provided through group insurance contracts, is designed to provide Plan participants with an insured source of retirement income.  *Id.* ¶ 57.  Beginning at age fifty, account funds are gradually shifted from nonsecure asset classes, such as stocks and bonds, into a portfolio backed by third-party insurance companies as the participant approaches retirement age.  *Id.* ¶ 57 n.36.  Then, once the participant reaches retirement age, typically sixty-five, the insurance companies make annual payments to the participant for the remainder of their or their spouse's lifetime.  *Id.*  The following chart demonstrates how a typical Plan participant's retirement savings are allocated among the LIS component portfolios over the Plan participant's lifetime when the Plan participants opts into the SIP:



Dkt. No. 28-1 at ECF p. 55.  If a participant opts to make the allocation to the SIP, they are charged an insurance fee of one percent of the SIP balance per annum.  Dkt. No. 19 ¶ 57.  The SPD states that the insurance fee acts to reduce the investment return of the participant's SIP.  *Id.*  The one percent insurance fee is roughly double the fee burden that is typically associated with retirement funds that are comparable to the LIS.  *Id.* ¶ 58.

In addition to the LIS, the Plan also offers a number of proprietary, AllianceBernstein-branded investment options.  *Id.* ¶ 62.  These other options, which include mixed asset allocation strategies, stocks-specific strategies, and bonds-specific strategies, also underperformed their stated benchmarks during the period relevant to this action.  *Id.* ¶ 63.  Despite the underperformance, the Plan continued to invest in proprietary AllianceBernstein options, and even added new proprietary investment options as they were developed.  *Id.* ¶¶ 68–71.

Plaintiffs bring this action as a civil enforcement action under ERISA §§ 404, 406, 409, and 502(a), 29 U.S.C. §§ 1104, 1106, 1109, and 1132(a), on behalf of all Plan participants who invested in the Plan on or after December 14, 2016, Dkt. No. 19 ¶¶ 3–4.  Plaintiffs seek declarations that Defendants breached their fiduciary duties, disgorgement of profits incurred unjustly in violation of ERISA, restoration of all losses attributable to violations of ERISA, equitable restitution, certification of this action as a class action, injunctive relief barring Defendants from any further violations of their ERISA fiduciary duties, attorneys' fees and costs, and any other relief that the Court deems equitable.  Dkt. No. 19 at 50–51.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by filing a complaint on December 14, 2022.  Dkt. No. 1.  On February 24, 2023, Defendants moved to dismiss the complaint in its entirety.  Dkt. Nos. 11–14.  Instead of opposing the motion to dismiss, Plaintiffs filed the Amended Complaint on April 11, 2023.  Dkt. No. 19.  The Court thus denied Defendants' motion to dismiss as moot.  Dkt. No.

20.  Defendants filed a renewed motion to dismiss on April 25, 2023, along with a memorandum

of law and declaration in support of the motion.  Dkt. Nos. 26–28.  Plaintiffs submitted a

memorandum of law in opposition to the motion on May 25, 2023.  Dkt. No. 30.  Defendants

filed a reply memorandum of law in further support of the motion to dismiss on June 26, 2023.

Dkt. No. 32.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of

the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement."  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has

facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*,

550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  When

adjudicating a motion to dismiss under Rule 12(b)(6), the court considers not only the well-

pleaded allegations of the complaint but documents incorporated by reference and "matters of

which judicial notice may be taken."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.

2002); *see Gray*, 454 F. Supp. 3d at 382–83.

**DISCUSSION**

Plaintiffs bring claims under ERISA for: (i) breach of the duties of prudence and loyalty under against AllianceBernstein, the Administrative Committee, and the Investment Committee, Dkt. No. 19 ¶¶ 100–06; (2) breach of the duty to monitor fiduciaries against the Compensation Committee, *id.* ¶¶ 107–14; (3) prohibited transactions with a party in interest against all Defendants, *id.* ¶¶ 115–23; (4) prohibited transactions with fiduciaries against all Defendants, *id.* ¶¶ 124–37; and (5) co-fiduciary liability against all Defendants, *id.* ¶¶ 138–44.

Defendants offer six categories of arguments in support of their motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.  Dkt. No. 27. First, Defendants assert that claims concerning the selection and retention of AllianceBernstein-branded proprietary investment options, namely the LIS, in the Plan lineup are barred by ERISA's six-year statute of repose.  *Id.* at 6–7.  Second, Defendants argue that Plaintiffs fail to allege a breach of the duty of loyalty because the use of AllianceBernstein proprietary funds does not give rise to an inference of disloyalty, and because Plaintiffs' allegations that Plan fiduciaries utilized AllianceBernstein funds to garner fees are speculative and do not raise a plausible inference of disloyalty.  *Id.* at 8–13.  Third, Defendants argue that Plaintiffs fail to allege imprudence because the Amended Complaint contains no allegations regarding the investment process, and because the allegations that are in the Amended Complaint fail to substantively establish imprudence.  *Id.* at 13–20.  Fourth, Defendants argue that Plaintiffs' claims that the Plan's investments in affiliated funds constituted prohibited transactions are time-barred and implausibly alleged.  *Id.* at 20–23.  Fifth, Defendants argue that the Amended Complaint fails to allege that the Plan Administrative Committee and the Plan Compensation Committee had fiduciary responsibilities.  *Id.* at 23–25.  Sixth and finally, Defendants argue that, in the event the

9

Court concludes that Plaintiffs have failed to establish their fiduciary breach and prohibited transaction claims, the co-fiduciary claims must fail as well. *Id.* at 25.

## I.     Breach of Fiduciary Duties

Plaintiffs bring claims under ERISA for breaches of the duty of loyalty, duty of prudence, the duty to monitor, and co-fiduciary liability.  Fiduciaries under ERISA are bound by "a number of detailed duties and responsibilities, which include the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251–52 (1993) (internal quotation marks omitted) (alteration in original).  "To state a claim for breach of fiduciary duty [under ERISA], a complaint must allege that (1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty." *Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *2 (S.D.N.Y. Mar. 25, 2022); *In re Pfizer ERISA Litig.*, 2009 WL 749545, at *6 (S.D.N.Y. Mar. 20, 2009) (citing 29 U.S.C. § 1109). ERISA assigns fiduciary status as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Under ERISA, a fiduciary must "discharge his duties with respect to a Plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ." *Id.* § 1104(a).[5]

---

[5] Defendants argue that Plaintiffs have failed to plausibly allege that the Plan Administrative Committee and the Compensation Committee were Plan fiduciaries acting within those

A.      **Duty of Loyalty**

Plaintiffs bring a claim for breach of the duty of loyalty against AllianceBernstein, the

Plan Administrative Committee, and the Plan Investment Committee ("Count I Defendants").

Dkt. No. 19 ¶¶ 100–06.[6]

ERISA dictates that "a fiduciary shall discharge his duties with respect to a plan solely in

the interest of the participants and beneficiaries . . . ." 29 U.S.C. § 1104(a)(1). It further

specifies that fiduciaries must with respect to the plan act "for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable

expenses of administering the plan." *Id.* § 1104(a)(1)(A). "The Second Circuit has described the

duty as one requiring a fiduciary to act . . . with an 'eye single to the interests of the participants

and beneficiaries.'" *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y.

2018) (quoting *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003)), *aff'd*

*sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019). Specifically, "[t]o state a claim for

breach of loyalty, a plaintiff must allege facts that permit a plausible inference that the defendant

engaged in transactions involving self-dealing or [that] otherwise involve or create a conflict

between the trustee's fiduciary duties and personal interests." *Vellali v. Yale Univ.*, 308 F. Supp.

3d 673, 688 (D. Conn. 2018) (internal quotation marks and brackets omitted). As relevant here,

"a plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's

_____

capacities with respect to the challenged conduct. Dkt. No. 27 at 23–25. Because the Court
concludes that Plaintiffs have failed to allege that any Defendants have engaged in conduct
constituting a breach of ERISA fiduciary duty, the Court need not address Defendants'
argument.

[6] Plaintiffs assert in a single cause of action "Breach of Duties of Prudence and Loyalty." Dkt.
No. 19 at 41. The duty of loyalty and the duty of prudence, however, are grounded in different
provisions of ERISA. "The duty of loyalty is based in 29 U.S.C. § 1104(a)(1)," while "[t]he duty
of prudence is grounded in 29 U.S.C. § 1104(a)(1)(B)." *Patterson v. Morgan Stanley*, 2019 WL
4934834, at *7 (S.D.N.Y. Oct. 7, 2019). Although they are plead under a single caption, the
Court treats them as distinct causes of action for the purposes of this motion.

financial products; rather 'a plaintiff must allege plausible facts supporting an inference that the defendant acted for the purpose of providing benefits to itself or someone else.'" *Patterson*, 2019 WL 4934834, at *12 (quoting *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017), *vacated on other grounds*, 9 F.4th 95 (2d Cir. 2021)); *see also Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (granting motion to dismiss claim for breach of duty of loyalty "[b]ecause these claims do not support an inference that defendants' actions were for the purpose of providing benefits to themselves or someone else and did not simply have that incidental effect").

Defendants argue that Plaintiffs fail to plausibly allege a breach of loyalty because the use of AllianceBernstein proprietary funds does not give rise to an inference of disloyalty, and because Plaintiffs' allegations that fiduciaries selected and retained AllianceBernstein proprietary funds to generate fees are impermissibly speculative.  Dkt. No. 27 at 8–13. Defendants argue that "ERISA and its implementing regulations . . . authorize the use of affiliated productions in plans," and that such use therefore cannot give rise to an inference of disloyalty.  *Id.* at 8–9.  Defendants further argue that because AllianceBernstein waived all fees when its proprietary funds were used in the Plan, it cannot be that AllianceBernstein was motivated to include proprietary funds in the Plan by a desire to increase its revenue and profit. *Id.* at 8.  Additionally, Defendants refute Plaintiff's contention that, even if Plan assets were not allocated to affiliated funds to generate fees, Plan assets were allocated to affiliated funds in order to support the investment management business in the broader marketplace by pointing out that Plan assets represent only 0.2% of AllianceBernstein's total assets under management.  *Id.* at 10.  In summary, Defendants argue that in the absence of any factual allegations that use of affiliated funds drove fee revenue, otherwise supported the investment management business, or

was the product of a faulty process, the Amended Complaint includes nothing that could give rise to a claim for breach of the duty of loyalty.  *Id.* at 8–13.

Plaintiffs respond that their fiduciary duty claim arises from investment underperformance, and not any allegation of excessive fees.  Dkt. No. 30 at 5–6.  Further, Plaintiffs argue that Defendants benefit by virtue of their inclusion of affiliated funds in the Plan because such inclusion promotes Defendants' proprietary investment products, and that in any case, Defendants' motivation for devoting Plan assets to the affiliated funds is a question of fact not suitable for resolution at the motion to dismiss stage.  *Id.* at 6–7.  Finally, Plaintiffs argue that under *Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022), Defendants' beneficial act of waiving fees does not negate Defendants' other allegedly unlawful behavior, Dkt. No. 30 at 7.

Plaintiffs fail to allege that Defendants breached a duty of loyalty owed them.  In the Amended Complaint, Plaintiffs make the conclusory allegation that the Count I Defendants "were driven by their desire to drive revenues and profits to AllianceBernstein and to generally promote AllianceBernstein's business interests."  Dkt. No. 19 ¶ 103.  But Plaintiffs do not allege specific facts that directly demonstrate Count I Defendants acted for a purpose other than providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.  Nor do Plaintiffs assert that it can be inferred that Count I Defendants selected and monitored Plan investments with the purpose of benefiting themselves or someone else because the proprietary funds charged Plan participants fees.  *See* Dkt. No. 30 at 5 ("Plaintiffs' Loyalty Claims . . . Exclusively Seek Relief for Investment Underperformance and Do Not Seek Relief Relating to Allegedly Excessive Fees[.]"); *cf. Moreno v. Deutsche Bank Ams. Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (holding a duty of

loyalty claim may lie where a "proprietary index fund . . . charged fees that were excessive compared with similar investment products").

Instead, Plaintiffs here assert it can be inferred that Count I Defendants acted with the disloyal motive of using Plan assets to "prop up the Partnership's investment management business, while other investors were exiting or decreasing their positions in these investments," Dkt. No. 19 ¶ 34, by using "Plan assets to sustain the Partnership's investment management business and resultant revenue in order to make up for the loss of other investors," *id.* ¶ 72, and by using "Plan assets as seed money to promote the Partnership's [new] proprietary investments," *id.*; *see* Dkt. No. 30 at 6–7. But each of those allegations, the thrust of which is that accumulation of assets itself confers benefits even in the absence of fee revenue, would be true any time a plan offered the plan sponsor's financial products. Accepting Plaintiffs' theory would require the Court to create an inference of disloyalty whenever an employee retirement plan offered proprietary investment options, an approach that has been rejected on numerous occasions. *Cf. Patterson*, 2019 WL 4934834, at *12 ("[A] plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's financial products[.]"). And more fundamentally, because the accumulation of assets in the Plan creates a benefit that—in the absence of fee income and if such benefit exists at all—is contingent upon subsequent decisions by other actors, any resulting benefit is incidental. *See Cunningham*, 2017 WL 4358769, at *4 (granting motion to dismiss duty of loyalty claims "[b]ecause these claims do not support an inference that defendants' actions were for the purpose of providing benefits to themselves or someone else and did not simply have that incidental effect"); *Patterson*, 2019 WL 4934834, at *14 ("[T]he mere fact that Morgan Stanley might incidentally benefit from its relationship with BlackRock is not enough to raise an inference of disloyalty by Defendants."). Here, Plaintiffs

allege no facts that could give rise to an inference that Defendants acted with the purpose of providing benefits to themselves or "someone else."  *See, e.g.*, *N. Jersey Plastic Surgery Ctr., LLC v. 1199SEUI Nat'l Ben. Fund.*, 2023 WL 5956142, at *14 (S.D.N.Y. Sept. 13, 2023) (dismissing claim for breach of duty of loyalty brought under ERISA due to failure to plausibly allege that a fund acted for the purpose of providing benefits to itself or someone else); *Anderson v. Advance Publ'ns, Inc.*, 2023 WL 3976411, at *3 (S.D.N.Y. June 13, 2023) (same).

The Supreme Court's holding in *Hughes* is inapposite.  As relevant here, the Court merely held that the availability of low-cost investment options does not itself eliminate "any concerns that other plan options were imprudent."  *Hughes*, 142 S. Ct. at 740.  But Defendants' motion to dismiss does not rest on the fact that the lack of fees charged alone negates otherwise imprudent conduct.  Instead, Defendants argue that the lack of fees charged is one plausible benefit to themselves that is absent from the allegations in this case.  Defendants proceed to argue that other benefits to them, such as the insignificant boost to their total assets under management, did not come about because Defendants acted with the purpose of securing those benefits.  In sum, Defendants' assertion that it did not charge fees is a single piece of a larger set of arguments, and those arguments together are not defeated because of the Supreme Court's holding in *Hughes*.

### B.    Duty of Prudence

Plaintiffs bring a claim for breach of the duty of prudence against Count I Defendants. Dkt. No. 19 ¶¶ 100–06.

ERISA also imposes a duty of prudence, which requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims."  29 U.S.C. § 1104(a)(1)(B).  "The duty of prudence

standard focuses 'on a fiduciary's conduct in arriving at an investment decision, not on its results.'" *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 157 (S.D.N.Y. 2017) (quoting *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 716 (2d Cir. 2013)).  "[A] claim for breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (internal quotation marks omitted).  Even so, "plaintiffs 'cannot rely, after the fact, on the magnitude of the decrease in the [relevant investment's] price,'" nor is it "necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions." *Id.* (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)).  Rather, "to survive a motion to dismiss pursuant to Rule 12(b)(6), Plaintiffs must allege facts sufficient to raise the plausible inference that Defendants breached their duty of prudence in view of the facts available *at the time* they made the challenged decisions." *Patterson*, 2019 WL 4934834, at * 9 (emphasis in original).  Such a showing does not require a plaintiff to make "factual allegations referring directly to" a fiduciary's "knowledge, methods, or investigations at the relevant times," but does require that a plaintiff set out "circumstantial factual allegations" that would allow the court to "reasonably infer from what is alleged that the [fiduciary's decision-making] process was flawed." *Pension Benefit Guar. Corp.*, 712 F.3d at 719 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).  "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context

specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (alteration in original).

The Second Circuit has instructed that courts exercise "particular care . . . in order to ensure that the complaint alleges nonconclusory factual content raising a plausible inference of misconduct and does not rely on the vantage point of hindsight." *Sacerdote*, 9 F. 4th at 107 (citation, ellipses, and alterations omitted); *see also Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at \*6 (S.D.N.Y. May 4, 2021) ("[T]he prudence *vel non* of a fiduciary's actions, under ERISA, is judged based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." (internal quotation marks omitted)).  Virtually any investment vehicle can be said to underperform its benchmark depending on the time frame that is chosen.  ERISA protects participants against imprudence; it does not, however, accord participants an insurance policy against market losses.  *See Patterson*, 2019 WL 4934834 ("ERISA does not require clairvoyance on the part of plan fiduciaries, nor does it countenance opportunistic Monday-morning quarter-backing on the part of lawyers and plan participants who, with the benefit of hindsight, have zeroed in on the underperformance of certain investment options."); *cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Accordingly, in order for underperformance to give rise to a claim for imprudence, "the underperformance must be substantial."  *Patterson*, 2019 WL 4934834, at \*10 (granting motion to dismiss claim for imprudence where the fund in question underperformed its benchmark by less than one percentage point over a ten-year period); *cf. Jacobs v. Verizon Commc'ns, Inc.*, 2017 WL 8809714, at \*9 (S.D.N.Y. Sept. 28, 2017) (denying motion to dismiss claim for imprudence where the "fund had an average annual return of 1.74% compared to its benchmark, which returned 10.37% over that same ten-year period").

Here, Plaintiffs do not include in the Amended Complaint any direct evidence regarding the investment evaluation process employed by Defendants.[7]  Instead, Plaintiffs aver that the Court can plausibly infer, based upon the underperformance of certain Plan investment options as compared to alternative, better-performing investments, that the process for selecting and monitoring the menu of investment options available in the Plan was flawed, or that adequate investigation would have revealed to a reasonable fiduciary that the investment decisions were improvident.  *See* Dkt. No. 30 at 5 (stating that Plaintiffs "exclusively seek relief for investment underperformance");[8] Dkt. No. 19 ¶ 40 ("[T]he relevant investment performance data, as well as the proprietary nature of the Plan investment selections, all support a strong inference that

---

[7] In their memorandum of law in opposition to the motion to dismiss, Plaintiffs assert that they "make numerous allegations about Defendants' fiduciary process as it relates to the Plan and this case."  Dkt. No. 30 at 11 (citing Dkt. No. 19 ¶¶ 2, 30, 38, 39, 40, 42, 52).  None of the allegations that the Plaintiffs cite in the Amended Complaint, however, "refer[] directly to [Defendants'] knowledge, methods, or investigations at the relevant times."  *Pension Benefit Guar. Corp.*, 712 F.3d at 718.  Instead, the cited allegations are circumstantial and, if they do support Plaintiffs' claims, they do so by giving rise to an inference of imprudence.  *See Saint Vincent Catholic Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*, 2010 WL 4007224, at *4 (S.D.N.Y. Oct. 4, 2010) ("[The Complaint] contains no allegations of inadequacy of Morgan Stanley's investigation of the merits of its investments.  Rather, plaintiffs premise their theory of liability on the poor results of the investments.").  As noted, an absence of direct evidence regarding process is not alone grounds for dismissal at this stage.  *Pension Benefit Guar. Corp.*, 712 F.3d at 718.
[8] Despite this representation by Plaintiffs in their memorandum in opposition to Defendants' motion to dismiss, the Amended Complaint includes allegations that "[w]ithout any existing performance history, [the LIS] became the Plan's QDIA."  Dkt. No. 19 ¶ 41.  Such allegations fail, as a matter of fact and as a matter of law, to create a plausible inference of imprudence.  As a matter of fact, Plaintiffs do not allege that any of the individual component portfolios comprising the LIS were novel when the LIS, a portfolio weighting mechanism was first established as the QDIA; nor does Plaintiffs allege that the LIS (perhaps as it would weigh the components by default for a participant of a given age) underperformed another fund of funds.  Thus as a matter of fact, Plaintiffs have not alleged that any investment option, whether a LIS component portfolio or the LIS as a weighting strategy, was both novel and subsequently underperformed.  And as a matter of law, incorporation of a new proprietary fund or strategy alone does rise to an inference of imprudence.  *See Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 706 (W.D. Mo. 2019); *Patterson*, 2019 WL 4934834, at *14 ("That the 2025 Trust was untested is also insufficient to establish imprudence in the selection and retention of the fund.").

Defendants failed to follow a prudent process in selecting and then monitoring the menu of investment options for Plaintiffs and other Participants who invested in the Plan."); *see also Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *5 (S.D.N.Y. Sept. 18, 2019) ("[W]here a plaintiff fails to allege facts about a defendant fiduciary's decision-making process, the claim may survive only if there are enough circumstantial factual allegations to allow the court to reasonably infer the process was flawed.").

Specifically, with respect to the LIS component portfolios, Plaintiffs allege that three out of the seven LIS components underperformed their stated benchmark between the inception of LIS on October 17, 2014 and March 31, 2022.  Dkt. No. 19 ¶ 45.  Specifically, the Volatility Management Portfolio underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 0.04%, and underperformed its stated benchmark from October 17, 2014 to March 31, 2022 by 2.25%, the Secure Income Portfolio underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 1.01%, and underperformed its stated benchmark from October 17, 2014 to March 31, 2022 by 1.22%, and the Real Asset Portfolio underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 1.88%, and underperformed its stated benchmark from October 17, 2014 to March 31, 2022 by 0.21%.  *Id.* ¶ 48.  Plaintiffs further allege that four of the seven LIS component portfolios underperformed their stated benchmarks between their inception in October 2014 and the end of 2019.  *Id.* ¶ 51.

Plaintiffs also allege that four other AllianceBernstein proprietary investment options underperformed their stated benchmarks.  *Id.* ¶ 62.  Specifically, Plaintiffs aver that the Wealth Strategy—Appreciation Asset Allocation Fund underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 3.31%, and underperformed its stated benchmark from

19

March 31, 2019 to March 31, 2022 by 1.12%,[9] the International Strategic Equities Fund overperformed its stated benchmark from March 31, 2021 to March 31, 2022, and underperformed its stated benchmark from March 31, 2019 to March 31, 2022 by 1.45%,[10] the Global Core Equity Fund underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 4.57%, and underperformed its stated benchmark from March 31, 2019 to March 31, 2022 by 1.87%, and the U.S. Strategies Equity Fund underperformed its stated benchmark from March 31, 2021 to March 31, 2022 by 0.86%, and underperformed its stated benchmark from March 31, 2019 to March 31, 2022 by 0.75%. *Id.* ¶ 63.

Finally, Plaintiffs highlight the underperformance of two funds more recently added to the Plan lineup: the International Strategic Equities Collective Trust added on March 2, 2018, and the U.S. High Yield Collective Trust added on March 1, 2021. *Id.* ¶¶ 70–71. Plaintiffs allege that in the one-quarter, one-year, and three-year periods ending March 31, 2022, the International Strategic Equities Collective Trust underperformed its stated benchmark by 0.57%, 1.51%, and 1.40%, respectively, and that since its inception the fund has underperformed its benchmark by 2.15%. *Id.* ¶ 70. With respect to the High Yield Collective Trust, meanwhile, Plaintiffs allege that in the one-year period ending March 31, 2022, the fund underperformed its stated benchmark by 0.25%. *Id.* ¶ 71.[11]

---

[9] Plaintiffs later allege that since its inception on August 31, 2007, the AllianceBernstein Wealth Strategy—Appreciation Asset Allocation Fund underperformed its stated benchmark by 0.36%. Dkt. No. 19 ¶ 73.
[10] Plaintiffs later allege that since its inception on March 2, 2018, the AllianceBernstein International Strategic Equities Fund underperformed its stated benchmark by 2.25%. Dkt. No. 19 ¶ 73.
[11] Plaintiffs also offer a comparison between the AllianceBernstein Wealth Strategy—Appreciation Asset Allocation Fund and the BlackRock Russell Large Cap Index Fund and the Vanguard Russell 3000 Index Fund. Plaintiffs aver that the AllianceBernstein Fund underperformed the BlackRock and Vanguard Funds over a ten-year period by 3.16% and 12.3%, respectively. Dkt. No. 19 ¶ 73. Plaintiffs do not, however, include any justification for

In sum, the underperformance of the greatest magnitude by any single AllianceBernstein proprietary investment option when compared to its stated benchmark, as alleged by Plaintiffs, was 4.57% over a single year for the Global Core Equity Fund. *See Id.* ¶ 63.  With respect to the LIS component portfolios, those most central to the Amended Complaint, the greatest underperformance alleged by Plaintiffs over the one-year period from March 31, 2021 to March 31, 2022 was 1.88% by the Real Asset Portfolio, and the greatest underperformance alleged by Plaintiffs from the inception of LIS to March 31, 2022 was 2.25% by the Volatility Management Portfolio.  *Id.* ¶ 45.  Such underperformance does not, however, create a plausible inference of misconduct and thereby state a claim for imprudence.  *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("No authority requires a fiduciary to pick the best performing fund.").

First, the alleged underperformance is not of sufficient duration or magnitude to create an inference of misconduct.  Comparable levels of underperformance have repeatedly been deemed insufficient to give rise to a claim for imprudence by courts in this Circuit.  *See Antoine v. Marsh & McLennan Cos., Inc.*, 2023 WL 6386005, at *11 (S.D.N.Y. Sept. 30, 2023) ("Plaintiffs' claims of underperformance miss the mark. . . .  [T]he lowest underperformance Plaintiffs cite is around 2.5 percent.  District courts in the Second Circuit and elsewhere have rejected claims based on similar or even more drastic underperformance metrics."); *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 148, 164 (E.D.N.Y. 2022) (granting motion to dismiss imprudence claim based in part on a 2.57 percent underperformance relative to a benchmark); *Bekker v. Neuberger Berman Grp. LLC*, 2018 WL 4636841, at *2, *7 (S.D.N.Y. Sept. 27, 2018); *Leber v. Citigroup 401(K)*

---

the use of the Blackrock and Vanguard funds as the bases for comparison with the selected AllianceBernstein fund.

*Plan Inv. Comm.*, 129 F. Supp. 3d 4, 14 (S.D.N.Y. 2015) ("Plaintiffs' allegations of the Fund['s] alleged underperformance in average annual returns as compared to certain benchmark indices or alleged insufficient performance history . . . do not raise a plausible inference that a prudent fiduciary would have found [the] Fund[ ] to be 'so plainly risky' as to render the investments in them imprudent." (quoting *Pension Benefit Guar. Corp.*, 712 F.3d at 719)).  The alleged underperformance also occurred over a relatively short period of time, with no data spanning more than five years.  *See Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *4 (N.D. Cal. Oct. 5, 2020) ("[A]llegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence."); *Gonzalez*, 632 F. Supp. 3d at 163 ("Plaintiff has not offered evidence of long-term underperformance relative to the benchmark indices.  She only offers calculations based only on three- and five-year trailing averages, without the ten-year data that is a traditional hallmark of viable claims based on underperformance relative to an index.").  The magnitude and the duration pleaded by Plaintiffs here are insufficient to give rise for a claim of imprudent retention based on underperformance.  *See Ferguson*, 2019 WL 4466714, at *9 ("Plaintiffs' allegations that certain investment options underperformed as compared to certain benchmarks do not raise a plausible inference that a prudent fiduciary would have found those investments to be 'so plainly risky' to render them imprudent."); *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 80 (2d Cir. 2013) (summary order) (affirming dismissal of imprudence claim where plaintiff relied on defendants' "decision in March 2011 to change from the Putnam Fund to the Vanguard Wellesley Income Fund as the Plan's default fund, the Putnam Fund's poor performance relative to comparable funds over the last five years, and the Fund's volatility and high management fees," because such allegations were "not adequate to permit a plausible inference the Defendants breached their fiduciary duties").

The cases cited by Plaintiff do not require a different outcome.  In *Krohnengold v. N.Y. Life Ins. Co.*, 2022 WL 3227812 (S.D.N.Y. Aug. 10, 2022), the court determined that the plaintiffs' allegations "that the funds had higher costs and fees than funds with similar, if not identical, investment strategies" served to "support a reasonable inference that the 'process' used by the [defendants] was 'flawed.'"  *Id.* at *3 (quoting *St. Vincent*, 712 F.3d at 718).  There is no allegation of elevated costs and fees here.  Similarly in *Moreno*, 2016 WL 5957307, the court held that the plaintiff's "specific allegations regarding excessive fees from which Defendants stood to gain is sufficient to support the inference that the process used by the defendants who were Plan fiduciaries to select and maintain the Plan's investment options was 'tainted by failure of effort, competence, or loyalty.'"  *Id.* at *6 (quoting *Braden*, 588 F.3d at 596).  Finally, in *Falberg v. Goldman Sachs Grp., Inc.*, 2020 WL 3893285 (S.D.N.Y. July 9, 2020), the court held that the plaintiff's "allegations that the [defendants'] funds underperformed and failed to warrant their elevated expense ratios as compared to similar funds sufficiently state[d] a claim of imprudence," because the plaintiff pleaded that "the expense ratios of similar *mutual funds* as well as index funds, [showed] that the [defendants'] expenses ratios were 1.1 to 3.7 times higher."  *Id.* at *9 (emphasis in original).  Here, however, Plaintiffs explicitly concede that they "exclusively seek relief for investment underperformance and do not seek relief relating to allegedly excessive fees."  Dkt. No. 30 at 5.

### C.    Duty to Monitor

Plaintiffs bring a claim for breach of the duty to monitor against AllianceBernstein and the Compensation Committee.  Dkt. No. 19 ¶¶ 107–14.

"The text of ERISA does not explicitly impose on plan fiduciaries a duty to monitor, however, several courts have held that there is a duty to monitor appointed fiduciaries under ERISA."  *Cunningham*, 2017 WL 4358769, at *11 (citing *In re Polaroid ERISA Litig.*, 362 F.

Supp. 2d 461, 477 (S.D.N.Y. 2005)).  "ERISA fiduciaries with the power to appoint and remove

other fiduciaries owe a duty 'to monitor the performance of those appointees.'"  *Patterson*, 2019

WL 4934834, at *15 (quoting *In re Morgan Stanley ERISA Litigation*, 696 F. Supp. 2d 345, 366

(S.D.N.Y. 2009)).  A duty to monitor claim does not lie, however, where there is not an

underlying breach of fiduciary duty.  *See Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56,

68 (2d Cir. 2016); *see also Jander v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 538, 546–47

(S.D.N.Y. 2016) ("Because Plaintiffs have failed to allege an underlying breach, the duty to

monitor claim is dismissed."); *In re Bear Stearns Cos., Inc., Sec., Derivative, & ERISA Litig.*, 763

F. Supp. 2d 423, 580 (S.D.N.Y. 2011) ("A claim for breach of the duty to monitor requires an

antecedent breach to be viable.").  Because Plaintiffs have failed to plausibly allege an

underlying breach, the duty to monitor claim must be dismissed.

### D.      Co-Fiduciary Liability

Plaintiffs bring a claim for co-fiduciary liability against all Defendants.  Dkt. No. 19

¶¶ 138–44.

"Every fiduciary, regardless of the parameters of its duties, is subject to the co-fiduciary

liability provision of Section 405(a), 29 U.S.C. § 1105(a) . . . ."  *In re WorldCom, Inc. ERISA

Litig.*, 354 F. Supp. 2d 423, 445 (S.D.N.Y. Feb. 1, 2005).  Section 405(a) states:

> In addition to any liability which he may have under any other provisions of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an
>> act or omission of such other fiduciary, knowing such act or omission is a
>> breach;
>>
>> (2) if, by his failure to comply with section 1104(a)(1) of this title [the
>> prudent man standard of care] in the administration of his specific
>> responsibilities which give rise to his status as a fiduciary, he has enabled
>> such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).  Under Section 405(a), "an ERISA trustee who deals with plan assets in

accordance with proper directions of another fiduciary is not relieved of its fiduciary duties . . . to

attempt to remedy known breaches of duty by other fiduciaries."  *FirsTier Bank, N.A. v. Zeller*,

16 F.3d 907, 911 (8th Cir. 1994).  In sum, "ERISA § 405(a), 29 U.S.C. § 1105(a) renders a

fiduciary liable for the breach of another fiduciary if he or she (1) participates knowingly in, or

knowingly undertakes to conceal, and act or omission of such other fiduciary, knowing such act

or omission is a breach; or (2) enables another fiduciary to commit a breach; or (3) has

knowledge of a breach by such other fiduciary, unless he makes reasonable efforts to remedy the

breach."  *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d at 367.  And at the motion to

dismiss stage, "[w]here a complaint adequately pleads a defendants' breach of fiduciary duty, the

complaint generally also states a valid claim for co-fiduciary liability against that same

defendant."  *Id.*

Where, however, a plaintiff fails "to plausibly allege a breach of fiduciary duty by any of

the . . . [d]efendants, [p]laintiff[] necessarily fail[s] to state a claim for co-fiduciary liability."  *In

re Nokia ERISA Litig.*, 2011 WL 7310321, at *6 (S.D.N.Y. Sept. 6, 2011); *see also In re Bear

Sterns*, 763 F. Supp. 2d at 580 ("[C]laims for co-fiduciary liability require antecedent breaches of

fiduciary duties by a co-fiduciar[y] to be viable.").  For the reasons already stated, Plaintiffs have

failed to plausibly allege a breach of fiduciary duty by any of the Defendants.  Plaintiffs' claims

for co-fiduciary liability must therefore be dismissed.

## II.    Prohibited Transactions

ERISA makes it unlawful for plan fiduciaries to engage in certain "prohibited

transactions."  29 U.S.C. § 1106; *see also Skin Pathology Assocs., Inc. v. Morgan Stanley & Co.*

*Inc.*, 27 F. Supp. 3d 371, 374 (S.D.N.Y. 2014) ("Congress, in addition to establishing basic standards of care, defined certain types of transactions in which fiduciaries may not engage or cause their plans to engage.").  Two provisions of Section 1106 are relevant here.  First, Section 1106(a) "supplements the fiduciary's general duty of loyalty . . . by categorically barring certain transactions" between a plan and a "party in interest."  *Harris Tr. & Sav. Bank v. Salmon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000).  Transactions prohibited by Section 1106(a) include the "furnishing of goods, services or facilities between the plan and a party in interest," and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"  29 U.S.C. § 1106(a)(1)(C)–(D).  "ERISA defines a 'party in interest' of an employee benefit plan to include 'a person providing services to such plan.'"  *Cunningham v. Cornell Univ.*, 86 F.4th 961, 973 (2d Cir. 2023) (quoting § 1002(14)(B)).

Second, Section 1106(b) prohibits certain transactions between a "fiduciary" and a plan, dictating that a fiduciary with respect to a plan shall not:

> (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

*Id.* § 1106(b).  Unlike Section 1106(a), which as noted supplements the fiduciary's general duty of loyalty, Section 1106(b) "'codifie[s]' certain core tenets of the duty of loyalty 'by prohibiting [a plan's fiduciary from engaging in] transactions tainted by a conflict of interest and thus highly susceptible to self-dealing[.]'"  *Cunningham*, 86 F.4th at 973.

ERISA also, however, exempts certain transactions from the categorical bars imposed by Section 1106.  "Section 1108, which, . . . is expressly referenced in the text of § 1106(a), then provides certain '[e]xemptions from prohibited transactions[.]'"  *Id.*  One of those exemptions

permits a plan to "[c]ontrac[t] or mak[e] reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2)(A). The Second Circuit has held "that at least some of those exemptions— particularly, the exemption for reasonable and necessary transactions codified by § 1108(b)(2)(A)—are incorporated into § 1106(a)'s prohibitions." *Cunningham*, 86 F.4th at 975. Thus, "to plead a violation of § 1106(a)(1)(C), a complaint must plausibly allege that a fiduciary has caused the plan to engage in a transaction that constitutes the 'furnishing of . . . services . . . between the plan and a party in interest' *where that transaction was unnecessary or involved unreasonable compensation*." *Id.* (quoting 29 U.S.C. §§ 1106(a)(1)(C), 1108(b)(2)(A)) (emphasis in original).

Plaintiffs bring a claim for prohibited transactions with a party in interest under Section 1106(a), Dkt. No. 19 ¶¶ 115–23, and a claim for prohibited transactions with a fiduciary under Section 1106(b), *id.* ¶¶ 124–37. With respect to the Section 1106(a) claim for allegedly prohibited transactions with a party in interest, Plaintiffs allege that "[b]y selecting and retaining AllianceBernstein Options, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders." *Id.* ¶ 119; *see also id.* ¶ 121 ("Defendants maintained numerous AllianceBernstein Options in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions."). With respect to the Section 1106(b) claim for allegedly prohibited transactions with fiduciaries, Plaintiffs allege, "AllianceBernstein dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable

direct or indirect fees to the Partnership or its subsidiaries, but also profited from the development of its investment management business due to the Plan's investment in AllianceBernstein Options, including the Plan assets used to seed the Partnership's untested proprietary funds . . . ." *Id.* ¶ 131; *see also id.* ¶ 135 ("These prohibited transactions took place on an ongoing basis throughout the Relevant Period when AllianceBernstein or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of AllianceBernstein's investment management business due to the inclusion of the AllianceBernstein Options in the Plan.").

Defendants challenge both the timeliness and the merits of Plaintiffs' prohibited transaction claims.  Dkt. No. 27 at 20–23.  In arguing that the claims are untimely, Defendants point to case law that the "only action that can support an alleged prohibited transaction is the initial selection of the affiliated funds." *Id.* at 20 (quoting *David v. Alphin*, 704 F.3d 327, 340–41 (4th Cir. 2013)).  Defendants argue that because the funds at issue in this action, the LIS and the AB Global Core Equity Collective Trust, were added to the Plan in 2014 and 2015 respectively, their selection falls outside ERISA's six-year statute of repose.  *Id.* at 20–21.  To argue that the claims lack merit, Defendants first assert that the prohibited transactions section of ERISA does not apply because no Defendant received any consideration for their own personal account by virtue of any of the challenged transactions, nor did AllianceBernstein collect any revenues from the challenged transactions.  *Id.* at 21–22.  Defendants next assert that they qualify for an exception under ERISA § 408(b)(2), which exempts from the prohibited transactions provisions transactions that are necessary for a plan and offer no more than reasonable compensation.  *Id.* at 22–23.

Plaintiffs respond that *David*, relied upon by Defendants to argue that the prohibited transactions claims are untimely, is not consistent with caselaw in this Circuit.  Dkt. No. 30 at 17 (citing *Moreno*, 2016 WL 5957307, at \*5).  On the merits of the claims, Plaintiffs respond that the "reasonable compensation" exemption invoked by Defendants is an affirmative defense that does not provide a proper basis for a dismissal motion made under Rule 12.  *Id.*  Plaintiffs also argue that the "reasonable compensation" exemption applies only to transactions with parties in interest, and not to transactions with fiduciaries.  *Id.* at 18.

### A.      Timeliness

The expiration of a statute of limitations is "an affirmative defense that a defendant must plead and prove."  *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  As a result, the requirement that a plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8, does "not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses," *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).  However, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).  If a review of the complaint and other permissible documents reveals "that the claims are prima facie time-barred, the burden is on the plaintiff to 'plausibly alleg[e] that they fall within an exception to the applicable statute of limitations.'"  *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 611–12 (S.D.N.Y. 2021) (quoting *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014)), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order).

ERISA applies "alternative limitations periods" that "depend[] on the underlying factual circumstances." *Janese v. Fay*, 692 F.3d 221, 227–28 (2d Cir. 2012). "The first period, applicable in the absence of any special circumstances, is six years from the date of the last action that was part of the breach." *Id.* at 228; *see also* 29 U.S.C. § 1113(1) (barring claims filed more than six years after "[t]he date of the last action which constituted a part of the . . . violation").

Plaintiffs allege in the Amended Complaint that three broad categories of transactions run afoul of Section 1106. First, Plaintiffs allege that Defendants' decision to include AllianceBernstein affiliated funds in the Plan lineup of investment options constitute prohibited transactions with parties in interest in violation of Section 1106(a), Dkt. No. 19 ¶ 119 ("By selecting and retaining AllianceBernstein Options, Defendants further caused the Plan to engage in transactions with parties in interest . . . ."), and with fiduciaries in violation of Section 1106(b), *id.* ¶ 133 ("Defendants named in this Count . . . violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain AllianceBernstein Options . . . ."). Second, Plaintiffs allege that Defendants' decision to retain AllianceBernstein affiliated funds in the Plan lineup of investment options during the Relevant Period constitute prohibited transactions with parties in interest in violation of Section 1106(a), *id.* ¶ 121 ("Defendants maintained numerous AllianceBernstein Options in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions."), and with fiduciaries in violation of Section 1106(b), *id.* ¶ 133 ("Defendants named in this Count . . . violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain AllianceBernstein Options . . . ."). Third, Plaintiffs allege that certain fees paid to AllianceBernstein in connection with the Plan constitute prohibited transactions, but only in violation of 1106(b). *Id.* ¶ 131 ("AllianceBernstein dealt with the assets

of the Plan in its own interest when it . . . caused the Plan to pay unreasonable direct or indirect

fees to the Partnership or its subsidiaries . . . ."); *id.* ¶ 134 ("These prohibited transactions took

place on an ongoing basis throughout the Relevant Period when AllianceBernstein or its

subsidiaries repeatedly received and collected unreasonable fees from the Plan . . . .").

Defendants argue that Plaintiffs' claims under 1106(a) and 1106(b) based upon the first

category of transactions, the selection of affiliated funds in the Plan lineup, are barred by

ERISA's six-year statute of limitations.  Dkt. No. 27 at 20.[12]  In their memorandum of law in

opposition to Defendants' motion to dismiss, Plaintiffs do not appear to dispute that the initial

selection and inclusion of affiliated funds in the Plan could not give rise to a claim for prohibited

transactions.  *See* Dkt. No. 30 at 23 ("To be clear, the Amended Complaint does not assert 'any

claim' based solely on allegations relating to the initial selection and inclusion of the LIS fund

series in the Plan.").  Plaintiffs have therefore abandoned any argument that their prohibited

transactions claims arising out of the initial inclusion of the affiliated funds in the Plan lineup are

timely.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at

*7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the

pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support

of dismissing that claim."); *Sullivan v. City of New York*, 2015 WL 5025296, at *4 (S.D.N.Y.

Aug 25, 2015) (explaining that a court "could properly deem a represented party to have

---

[12] Within the section on the timeliness of prohibited transactions claim, Defendants also argue
that the prohibited transaction claim based upon the second and third categories of transactions—
the retention of affiliated funds in the Plan lineup and the fees paid in connection with the use of
affiliated funds in the Plan—lack merit because the asserted transactions do not qualify as
transactions, and are attributable to Plan participants themselves, respectively.  Dkt. No. 27 at
20–21.  Because those arguments are better understood as regarding the legal merit, rather than
the timeliness, of the allegations, the Court addresses the arguments *infra* Section II.B.

abandoned claims if, in opposing a motion to dismiss multiple claims, it addressed only some of them").

Nor does *Moreno*, 2016 WL 5957307, at *5, require a different outcome.  There, "Defendants argue[d] that the claims [were] time barred because the only transaction allegedly prohibited under § 1106 [were] the initial decision to include the proprietary funds in the Plan and the proprietary funds were all initially selected" more than six years before the claims were brought.  *Moreno*, 2016 WL 5957307, at *5.  The court disagreed, noting that the complaint in that case alleged "that the relevant prohibited transactions were the 'shareholder service fees' paid to DSC and the monthly payments made to DIMA and RREEF in exchange for investment management services, and not the selection of the proprietary funds."  *Id.*  The court found that the prohibited transaction claims were timely because the plaintiffs there alleged "that Defendants included the proprietary funds for the purpose of increasing the amount of fees paid to DIMA, RREEF and DSC," and that the complaint therefore "sufficiently allege[d] that the challenged transactions were indirect transfers to a party in interest."  *Id.*  The court did not, however, base its timeliness ruling on the initial inclusion of the proprietary funds in the investment lineup.

### B.      Failure to State a Claim

Plaintiffs have also failed to state a claim for prohibited transactions with respect to the retention of the affiliated funds in the Plan lineup, and with respect to fees relating to the use of affiliated funds in the Plan lineup.  First, the retention of affiliated funds in the Plan lineup does not qualify as a "transaction" under Section 1106.  *See David*, 704 F.3d at 341 ("Courts have held that a decision to continue certain investments, or a defendant's failure to act, cannot constitute a 'transaction' for purposes of section 406(a) or 406(b). . . .  We agree with this view."); *Wright v. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) ("The decision by

the Oremet Defendants to continue to hold 15% of Plan assets in employer stock was not a 'transaction.'"); *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1122, 1126 (C.D. Cal. 2009) ("SCE's alleged failure to act, however, cannot constitute a 'transaction' for the purposes of § 1106(a)(1)(D)."). The retention of affiliated funds in the Plan lineup therefore cannot serve as the basis for Plaintiffs' prohibited transactions claims.

Next, to the extent Plaintiffs bring a claim for prohibited transactions with a party in interest in violation of Section 1106(a) based upon fees relating to the use of affiliated funds in the Plan lineup, those claims also fail.[13]  Plaintiffs have not plausibly alleged that "a fiduciary has caused the plan to engage in a transaction that constitutes the 'furnishing of . . . services . . . between the plan and a party in interest' *where that transaction was unnecessary or involved unreasonable compensation*." *Id.* (quoting 29 U.S.C. §§ 1106(a)(1)(C), 1108(b)(2)(A)) (emphasis in original).  Plaintiffs concede that the Amended Complaint contains no allegations that the fees, commissions, or expenses constituted unreasonable compensation.  *See* Dkt. No. 30 at 6 ("Plaintiffs do not seek relief in the Amended Complaint for allegedly excessive Plan-related fees . . . ."); *id.* at 7 ("Plaintiffs do not seek recovery of allegedly excessive fees under ERISA, as

---

[13] Plaintiffs make only passing references to fees in their claim for prohibited transactions with a party in interest in violation of Section 1106(a). *See* Dkt. No. 19 ¶¶ 115–23. Specifically, Plaintiffs allege that, "[b]y selecting and retaining AllianceBernstein Options, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, *were subject to redemption fees and sales commissions*, and/or were on terms less favorable than those offered to other shareholders[,]" *id.* ¶ 119 (emphasis added), and that "[a]s a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable fees and expenses," *id.* ¶ 122. Neither allegation seems to assert that the fees, commissions, or expenses themselves constituted prohibited transactions; rather, the allegations complain that the fees, commissions, or expenses arose out of the allegedly prohibited transactions—here, the selection and retention of affiliated funds in the Plan lineup.

such, in this matter, and have only raised the issue of fees in connection with the performance of the LIS funds at issue here[.]").

      Finally, to the extent that Plaintiffs bring a claim for prohibited transactions with a fiduciary in violation of Section 1106(b) based upon fees relating to the use of affiliated funds in the Plan lineup, those claims also fail.[14]  The only fees that are alleged to have been charged as a result of the inclusion of AllianceBernstein affiliated funds in the Plan lineup are fees associated with the LIS insurance feature.  *See* Dkt. No. 19 ¶¶ 26, 57–59.  The Amended Complaint contains no other allegations of fees, commissions, or expenses, and Plaintiffs do not dispute Defendants' repeated contention that other fees, commissions, and expenses were waived.  *See* Dkt. No. 27 at 1 ("AllianceBernstein waives its investment management fees for the AB Funds in the Plan and bears the operating expenses on Plan participants' assets invested in those funds. Thus, other than an optional fee paid to insurance companies for a market protection feature available on one of the ten AllianceBernstein investment options, participants have access to the AB Funds in the Plan for virtually nothing, maximizing their ability to grow their retirement savings."); *id.* at 3 ("Plan participants do not pay any investment management or operating expense fees on their assets in the AB Funds."); *id.* at 9 ("AllianceBernstein has waived all of its fees when the AB Funds are used in the Plan."); Dkt. No. 30 at 6 ("While AllianceBernstein, of course, may lose some revenue by not charging Plaintiffs recordkeeping fees and operating expenses relating to the AB Funds at issue here . . . ."); *id.* at 7 (referencing Defendants' "fee

---

[14] Defendants bear the burden of proof that the transactions are eligible for an exemption under Section 1108 from claims brought under Section 1106(b).  *See Cunningham*, 86 F.4th at 977 ("By contrast [to § 1106(a)], § 1106(b) on its face is restricted only to transactions carrying indicia of a conflict of interest—and, as already noted, does not directly incorporate the § 1108 exemptions.").  The question whether the transactions are exempt is therefore not fit for resolution at the motion to dismiss stage.  *Dixon*, 480 F.3d at 640.

waivers"); *id.* at 13 ("Defendants' fee waivers, while seemingly munificent, are not sufficient to show the Defendants managed other aspects of the Plan, such as selecting and retaining investments, prudently consistent with ERISA.").

But the insurance fees, as pleaded by Plaintiffs, cannot give rise to a claim for prohibited transactions between a plan and a fiduciary because Plaintiffs do not allege that the insurance fees were charged for the benefit of any fiduciary's "own account," 29 U.S.C. § 1106(b)(3), or resulted in consideration for any fiduciary's "own personal account," *id.* § 1106(b)(3).  The Amended Complaint does not include any allegation that the insurance fees are paid to Defendants or any other fiduciary.  *See* Dkt. No. 19 ¶ 26 ("[I]f a Participant's LIS account is allocated to the Secure Income Portfolio . . . , that Participant will be charged an insurance fee at an annual rate of 1% of the Participant's SIP account balance."); *id.* ¶ 57 ("Participants are charged with this annual insurance fee when their Plan funds are allocated to the SIP (beginning at age 50 at the earliest)."); *id.* ¶ 58 ("As such, virtually every Participant whose retirement savings are invested in the LIS becomes subject to the annual insurance fee once reaching the age of 50—which insurance fee is, among other things, roughly double the fee burden typically associated with retirement plan-suitable target date funds as to which the LIS investments are otherwise comparable."); *id.* ¶ 59 ("Based on the 2016 through 2021 Form 5500 filings, the participant account balances in the Secure Income Portfolio and fees Participants paid for investing in these newly established investments are as follows . . . .").  Defendants assert that these fees are paid to third-party insurance providers.  Dkt. No. 27 at 1 (noting that the insurance fees are "paid to insurance companies").  Plaintiffs do not dispute that contention.  *See* Dkt. No. 30.  Plaintiffs have thus failed to plausibly allege that the insurance fees fall within the scope of Section 1106(b)'s prohibitions.  *See, e.g.*, *Mbody Minimally Invasive Surgery, P.C. v. United*

*Healthcare Ins. Co.*, 2016 WL 4382709, at *11 (S.D.N.Y. Aug. 16, 2016).  The Amended

Complaint therefore does not contain any plausible allegation of a prohibited transaction in

violation of Section 1106, and those claims must also be dismissed.

## CONCLUSION

Defendants' motion to dismiss is GRANTED and the Amended Complaint is dismissed

without prejudice to the filing of a motion for leave to amend within thirty days of the date of

this Opinion and Order.  If a motion to amend is not filed within thirty days of the date of this

Opinion and Order, or such subsequent date that the Court upon motion shall order, the action

will be dismissed with prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 26.


SO ORDERED.


Dated: March 25, 2024                                 _____
New York, New York                                        LEWIS J. LIMAN
                                                          United States District Judge

36